**CARLTON ENERGY GROUP, LLC,**
**Appellant/Cross–Appellee,**

**v.**

**Gene E. PHILLIPS, Individually and d/b/a Phillips Oil Interests L.L.C., EurEnergy Resources Corporation, Syntek West, Inc. and CabelTel International Corporation, Appellees/Cross–Appellants.**

**No. 01–09–00997–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 14, 2012.

Jeffrey L. Oldham, Warren W. Harris, Bracewell & Giuliani LLP, Kendall C. Montgomery, Paula Janecek Mathers, William F. Hagans, Hagans, Burdine, Montgomery & Rustay, P.C., Kevin H. Dubose, Roger D. Townsend, Alexander Dubose & Townsend, LLP, David M. Gunn, Beck, Redden & Secrest, L.L.P., Houston, TX, Vincent L. Marable, III, Paul Webb, P.C., Wharton, TX, Thomas R. Phillips, Baker Botts, L.L.P., Austin, TX, for Appellant.

Charles Imlay Appler, Mark E. Bennett, Bennett, Weston & Lajone, P.C., Mitchell Madden, The Law Offices of Mitchell Madden, Thomas V. Murto III, Madden Sewell, LLP, Dallas, TX, Evan A. Young, Baker Botts L.L.P., Austin, TX, Henry W. Simon Jr., Barlow, Garsek & Simon, L.L.P., Fort Worth, TX, J. Kevin Oncken, Jeffrey H. Uzick, Uzick & Oncken, P.C., Joseph M. Nixon, Beirne, Maynard & Parsons, L.L.P., Peter M. Kelly, Kelly, Durham & Pittard, LLP, Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, HIGLEY, and SHARP.

## OPINION

TERRY JENNINGS, Justice.

Appellant/cross-appellee, Carlton Energy Group, LLC ("Carlton"), challenges the trial court's judgment, entered after Carlton accepted the trial court's suggested remittitur of the jury's actual damages award in lieu of a new trial,[1] in Carlton's suit against appellees/cross-appellants, Gene E. Phillips, individually and doing business as Phillips Oil Interests L.L.C. ("Phillips"), EurEnergy Resources Corporation, formerly known as EurEnergy Resources LLC ("EurEnergy"), Syntek West, Inc. ("Syntek"), and CabelTel International Corporation ("CabelTel") for tortious interference with contract and breach of contract. In three issues, Carlton contends that the trial court erred in "suggesting a remittitur to $31.16 million in actual damages when factually-sufficient evidence supports the jury's finding of actual damages of $66.5 million or, alternatively at least $38 million"; setting aside the jury's alter ego findings against Syntek and CabelTel; and not imposing joint and several liability on Phillips for the exemplary damages awarded against EurEnergy "when the jury found Phillips responsible for EurEnergy's conduct."

In their cross-appeal, Phillips and EurEnergy, in their first six issues, contend that the evidence is legally and factually insufficient to support the trial court's award of $31.16 million in actual damages; the jury's finding that Phillips and EurEnergy tortiously interfered with Carlton's

1. Carlton accepted the trial court's suggested remittitur subject to its right to appeal. *See* Tex R.App. P. 46.2 (providing that party who remits judgment at trial court's suggestion

may complain about remittitur on appeal if party benefiting from remittitur appeals and remitting party independently perfects appeal).

contract with CBM Energy Limited ("CBM"); the jury's awards of exemplary damages against Phillips and EurEnergy; the jury's finding that Phillips breached his contract with Carlton; the jury's awards of attorney's fees to Carlton; and the jury's finding that EurEnergy is Phillips's alter ego. In their seventh issue, Phillips and EurEnergy contend that the trial court's "erroneous admission of voluminous, irrelevant evidence about Phillips-related companies was harmful and prejudicial" and requires a new trial.

We affirm in part and reverse and render in part.

## Background

On October 4, 2000, CBM entered into an agreement with the government of the country of Bulgaria (the "Bulgaria/CBM concession") permitting CBM to conduct exploration and prospecting for natural gas on a large parcel of land located within that country (the "Bulgaria Project"). The Bulgaria/CBM concession provided CBM with an initial term of three years to conduct the prescribed exploration and the possibility of two extension periods of no more than two years each. The Bulgaria/CBM concession also defined CBM's "minimum work obligations," which included the drilling of one exploratory well, which, if successful, would require the drilling of two additional wells.

On April 25, 2003, CBM, in need of financing to satisfy its obligations under the Bulgaria/CBM concession, entered into a letter agreement with Carlton (the "CBM/Carlton agreement") under which Carlton, in exchange for making, pursuant to a schedule, three tranches[2] of funding totaling $8 million, would acquire, incrementally, a 48% interest in the Bulgaria

Project. Upon "actual[ ] fund[ing]" of the first tranche of $1.25 million, which was to be applied to cover the costs for drilling the first well, as well as other incidental costs, Carlton would acquire a 7.5% interest in the Bulgaria Project. Additionally, upon the actual funding of the first tranche, the "arrangement" between CBM and Carlton would become "exclusive." Carlton would then have three months to "actually fund" the second tranche of $1.5 million, which was to be applied to cover the costs of two additional wells. Carlton would then have one year after the date of the second tranche to "actually fund" the remainder of its $8 million financing commitment.

In 2004, Bulgaria, by way of an annex to the Bulgaria/CBM concession, granted CBM a two-year extension of the Bulgaria Project. In turn, on April 13, 2004, CBM and Carlton amended the CBM/Carlton agreement so that upon Carlton's "actually fund[ing]" of a first tranche of $900,000, Carlton would be entitled to a 5.4% interest in the Bulgaria Project and, as with the original agreement, the "arrangement" between CBM and Carlton would become "exclusive." Carlton would then have three months to "actually fund" the second tranche of $1.85 million and one year after the date of the second tranche to "actually fund" the remainder of its $8 million financing commitment. The CBM/Carlton agreement, as amended, further provided that it would not become effective until "actual funding" of the first tranche and "actual funding" would occur if Carlton funded $300,000 in cash and a $600,000 letter of credit. Carlton presented evidence that CBM subsequently agreed to an oral modification of the terms regarding

---

**2.** Tranche is defined as "a portion of something, esp. money: *they released the first tranche of the loan.*" David Bach, 1001 Financial Words You Need to Know 202 (Oxford University Press 2003).

the second tranche, and the jury specifically found that CBM had "agree[d] that the timing of the second tranche of funding ($1,850,000) would take place within 90 days of the funding of the initial tranche or 30 days after receipt of logs for the initial well, whichever date was later." Phillips and EurEnergy disputed that such an oral amendment was ever made, or could have been made, and they asserted that Carlton was not entitled to an additional 30–day period to review the logs from the initial well before making the second tranche.

On April 27, 2004, Carlton, with funds provided by investor Robert Assil, furnished the $600,000 letter of credit, and it is undisputed that this letter of credit was sufficient to extend the Bulgaria/CBM concession to 2005. Subsequently, on July 20, 2004, Carlton, with funds provided by investor Kenneth Scholz, transferred the remaining $300,000 in its attempt to satisfy the first tranche of funding prescribed in the amended CBM/Carlton agreement. At trial, Carlton asserted that it had satisfied its first tranche obligation and, thus, it earned its "vested" 5.4% interest in the Bulgaria Project and obtained its right to fund the second tranche. Phillips and EurEnergy disputed this and emphasized that on July 27, 2004, after receiving the $300,000 wire transfer, CBM sent Carlton a letter in which it noted that it would not agree to certain restrictions placed by Scholz on the $300,000 payment. In the letter, CBM noted that Carlton's funding obligations were "absolute," the parties had not contemplated "partial funding," the wire transfer did "not constitute performance," and CBM would not agree to an extension for Carlton to make the second tranche. Carlton presented evidence that, despite this letter, it and CBM subsequently conducted themselves as if Carlton had satisfied the first tranche of funding.

Believing that it had satisfied the first tranche of funding, Carlton, in the course of seeking additional resources to fund its remaining obligations, came into contact with Phillips. In the summer of 2004, Carlton, in a proposed letter agreement, offered Phillips the right to acquire a "10% working interest" in the Bulgaria Project in exchange for $8.5 million. Carlton was to use the cash infusion to fulfill its funding obligations under the CBM/Carlton agreement, and its 48% interest in the Bulgaria Project would be reduced to 38% with Phillips's acquisition from Carlton of the 10% interest. On August 23, 2004, Phillips signed the letter agreement (the "Carlton/Phillips agreement") with an "addendum" that provided that Phillips would "have a 30 day period to review all documentation and technical information in connection with [the Bulgaria Project]" and "[i]f for any reason" he was "not satisfied with [his] investigation then [he would] withdraw from this agreement."

Carlton, at trial, contended that its chairman and managing director, T.C. O'Dell, signed and accepted Phillips's counteroffer and, thus, it formed a contractual relationship with Phillips. O'Dell testified that he signed the Carlton/Phillips agreement with Phillips's addendum "shortly" after receiving it from Phillips, and Carlton introduced a fully executed copy of it into evidence. O'Dell explained that Carlton, pursuant to ordinary procedures, would have sent a fully executed copy of the Carlton/Phillips agreement to Phillips, but he conceded that Carlton did not possess a record of having sent a copy to Phillips.

The undisputed evidence presented at trial demonstrates that Phillips, in September 2004, shortly after he had signed the Carlton/Phillips agreement, met with Carlton representatives, including O'Dell, regarding the Bulgaria Project. Never-

theless, Phillips testified that he had never received notice that Carlton had accepted the terms of what he described as his "counteroffer" and, thus, he had never formed a contractual relationship with Carlton.

Phillips did not provide to Carlton any funding pursuant to the Carlton/Phillips agreement. And Carlton presented evidence that during the fall of 2004, when it was providing Phillips with technical information about the Bulgaria Project, Phillips and his representatives, without Carlton's knowledge, were in direct contact with CBM about the Bulgaria Project. Carlton contended that this evidence demonstrates that Phillips, beginning in the early fall of 2004, was taking steps to supplant Carlton in the Bulgaria Project "by secretly dealing with CBM." Phillips countered with evidence that he withdrew from the Carlton/Phillips agreement for business reasons. According to Phillips, he "quickly became disenchanted with Carlton" and O'Dell during his "due diligence efforts" and, by mid-November 2004, he had already informed a Carlton broker that he had no interest in working with Carlton. On December 3, 2004, Phillips sent Carlton a letter in which he stated that because of "tight time constraints," he was "unable to make a determination to participate in this venture," and he declined "to go forward with any proposed transaction."

On February 10, 2005, EurEnergy, a company which was later revealed to be connected to Phillips, sent CBM a letter outlining the details of a joint development agreement between EurEnergy and CBM regarding the Bulgaria Project. CBM agreed, upon EurEnergy's funding, to declare Carlton in default of the CBM/Carlton agreement and return Carlton's investment. EurEnergy agreed to "replace" the $600,000 letter of credit that had been posted by Carlton and indemnify CBM in

any future legal proceedings brought against it by Carlton. EurEnergy and CBM, on February 11, 2005, executed a joint development agreement (the "CBM/EurEnergy JDA"), in which CBM acknowledged that it needed financing for the Bulgaria Project and EurEnergy agreed to fund at least $6.5 million in exchange for a conditional 60% interest in the Bulgaria Project.

CBM, on February 25, 2005, in satisfaction of its agreement with EurEnergy, sent Carlton a notice stating that Carlton's "material breach of the critical funding terms," including Carlton's failure to make the second tranche, forced it to seek reliable financing for the Bulgaria Project. CBM offered to remit to Carlton the $900,000 it had funded, but only if Carlton would acknowledge that it had no further interest in the Bulgaria Project.

CBM and EurEnergy's relationship subsequently soured, and litigation between CBM and EurEnergy ensued. In May 2006, Phillips, on behalf of EurEnergy, signed a settlement agreement of its suit against CBM, and EurEnergy reaffirmed its obligations and liabilities to CBM "concerning the Carlton matter." Subsequently, Bulgaria terminated the Bulgaria/CBM concession.

In December 2006, Carlton sued Phillips and EurEnergy, along with several other Phillips-related entities, including CabelTel and Syntek, that Carlton alleged were involved in tortious conduct and breach of contract. Specifically, Carlton alleged that Phillips had breached the Carlton/Phillips agreement, Phillips and EurEnergy had tortiously interfered with the CBM/Carlton agreement, and CabelTel and Syntek were alter egos of EurEnergy.

After a lengthy trial, the jury, in regard to Carlton's breach-of-contract claim, found that Carlton and Phillips entered into the Carlton/Phillips agreement; Carl-

ton agreed to the terms, including those set forth in Phillips's addendum, before receiving a December 3, 2004 letter from Phillips in which he declined participation with Carlton in the Bulgaria Project; Phillips did not send his December 3, 2004 letter in compliance with the terms of the addendum, i.e., the provision providing Phillips 30 days to review documentation and technical information; Phillips failed to comply with the Carlton/Phillips agreement; and Phillips's failure to comply was not excused. In regard to damages, the trial court instructed the jury to award damages for "[t]he fair market value" of Carlton's "interest in the project, if any, at the time of the failure to comply," and the jury found that Phillips's failure to comply caused Carlton $66.5 million in actual damages.

In regard to Carlton's tortious-interference claim, the jury found that Carlton had complied with the provision in the CBM/Carlton agreement requiring Carlton to "actually fund[ ]" the initial $900,000; CBM and Carlton had agreed that the timing of the second payment of $1.85 million "would take place within 90 days of the funding of the initial tranche or 30 days after receipt of logs for the initial well, whichever date was later"; CBM failed to comply with the CBM/Carlton agreement; Phillips and EurEnergy intentionally interfered with the CBM/Carlton agreement; neither Phillips nor EurEnergy had a "good faith belief" that it had the right to interfere with the CBM/Carlton agreement; and, by clear and convincing evidence, the harm caused by Phillips and EurEnergy to Carlton resulted from malice. The jury found that Phillips and EurEnergy's interference caused Carlton $66.5 million in actual damages; Phillips was "responsible for the conduct of . . .

EurEnergy"; and CabelTel and Syntek were the alter egos of EurEnergy.

The trial court then conducted the exemplary-damages phase of trial, after which the jury assessed $8.5 million in exemplary damages against Phillips and $8.5 million in exemplary damages against EurEnergy. The parties then tried the issue of attorney's fees to the court, and the trial court found that Carlton was entitled to $9,954,000 in attorney's fees for trial, $750,000 in attorney's fees in the event of an appeal to the court of appeals, and $250,000 for attorney's fees in the event of an appeal to the Texas Supreme Court.

Carlton moved for judgment on the jury verdict, and Phillips, EurEnergy, CabelTel, and Syntek moved for a judgment notwithstanding the verdict. The trial court granted a judgment notwithstanding the verdict in favor of Syntek and CabelTel, concluding that there is no evidence to support the jury's alter ego findings. The trial court, sua sponte, determined that the jury's actual damages award of $66.5 million for breach of contract and tortious interference is not supported by factually-sufficient evidence and suggested a remittitur to $31.16 million. Carlton accepted the remittitur, but reserved its right to appeal.[3]

In its final judgment, the trial court awarded Carlton $31.16 million in actual damages on its tortious-interference claim against Phillips and EurEnergy, jointly and severally, and assessed exemplary damages against Phillips and EurEnergy in the amount of $8.5 million each, severally.

## Tortious Interference

In their second issue in their cross-appeal, Phillips and EurEnergy argue that

---

3. *See* Tex.R.App. P. 46.2.

the evidence is legally and factually insufficient to support the jury's finding that Phillips and EurEnergy tortiously interfered with the CBM/Carlton agreement because Carlton had no valid contract with CBM as Carlton had forfeited any interest it held under the CBM/Carlton agreement, CBM did not fail to comply with the CBM/Carlton agreement, there was no valid oral modification to the CBM/Carlton agreement, Phillips and EurEnergy did not intend to wrongfully interfere with any such agreement, and Phillips and EurEnergy's alleged interference was based on their "good-faith exercise of colorable rights."

In order to recover damages on a claim for tortious interference with a contract, a plaintiff must prove (1) the existence of a contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) the interference proximately caused the plaintiff's injury; and (4) actual damages or loss. *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 77 (Tex.2000).

We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson,* 168 S.W.3d 802, 810 (Tex.2005). In conducting a legal-sufficiency review, a "court must consider evidence in the light most favorable to the verdict, and indulge every reasonable inference that would support it." *Id.* at 822. The term "inference" means,

In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process

of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved. . . .

*Marshall Field Stores, Inc. v. Gardiner,* 859 S.W.2d 391, 400 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

If there is more than a scintilla of evidence to support the challenged finding, we must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998). " '[W]hen the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.' " *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)). However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so. *City of Keller,* 168 S.W.3d at 822; *see also King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003). "A reviewing court cannot substitute its judgment for that of the trier-of-fact, so long as the evidence falls within this zone of reasonable disagreement." *City of Keller,* 168 S.W.3d at 822.

In conducting a factual-sufficiency review, we must consider, weigh, and examine all of the evidence which supports and which is contrary to the jury's determination. *Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989). Because Carlton, not Phillips and EurEnergy, had the burden to prove liability at

trial, we may set aside the jury's verdict only if the evidence that supports the verdict is so weak as to make the verdict clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

In regard to Phillips and EurEnergy's primary argument that Carlton had no valid contract with CBM because Carlton had failed to comply with the funding provisions of the CBM/Carlton agreement, we note that Phillips and EurEnergy did not challenge the trial court's instruction to the jury. Also, the record reveals evidence demonstrating Carlton's compliance, CBM's conduct consistent with Carlton's compliance, and Carlton and CBM's modification of certain terms in the CBM/Carlton agreement.

■ The jury found that Carlton complied with the requirement in the CBM/Carlton agreement that it "actually fund[ ]" the $900,000 first tranche with a $300,000 cash payment and a $600,000 letter of credit, which then created between CBM and Carlton an "exclusive arrangement" with which Phillips and EurEnergy interfered. The evidence supports the jury's finding. It is undisputed that Carlton furnished CBM a $600,000 letter of credit, which, accepted by CBM, extended the Bulgaria/CBM concession. Carlton also funded the $300,000 cash portion of the tranche with the wire transfer of an investor, Kenneth Scholz.

It is true that Scholz included some restrictions with his $300,000 payment beyond the contemplation of the CBM/Carlton agreement. And CBM did object to these restrictions in its July 27, 2004 letter. However, Carlton, in August 2004, responded to CBM by letter, noting that the funds had been transferred, the restrictions placed by Scholz were "substantially the same" as those set forth in the CBM/Carlton agreement as amended by a subsequent oral agreement, and Carlton

considered the "funding requirement" to have been "fully complied with." Carlton explained that CBM had previously agreed, albeit orally, to allow Carlton a 30–day period to review the logs from the initial well before making the second tranche. Carlton also noted that although Scholz had requested a 45–day period to review the logs, he had since consented to the 30–day period to comport with Carlton and CBM's oral agreement already in place.

Significantly, Carlton presented evidence that it and CBM had continued to operate under the CBM/Carlton agreement as modified. CBM retained the entire first tranche, including the $300,000 wire transfer, for almost one year. Indeed, CBM used the $600,000 letter of credit to extend the Bulgaria/CBM concession, and it did not provide Carlton with any notice of default until February 25, 2005, after it had executed the CBM/EurEnergy JDA. Carlton also presented evidence that CBM, Phillips, and EurEnergy had themselves concluded that Carlton had "actually fund[ed]" the first tranche of $900,000 and had acquired a 5.4% interest in the Bulgaria Project. In fact, in the February 10, 2005 letter from EurEnergy to CBM, EurEnergy agreed to "replace" the $600,000 letter of credit that Carlton had posted. From this evidence, the jury could have reasonably found that Carlton actually funded the first tranche and the CBM/Carlton agreement constituted a valid and enforceable contract, which was subject to interference by Phillips and EurEnergy.

■ In regard to the modifications to the CBM/Carlton agreement, the trial court instructed the jury as follows,

> The Letter Agreement between Carlton Energy Group and Phillips and the Letter Agreements as amended between

[Carlton] and CBM contain provisions which state that the agreements cannot be orally modified or amended and that any amendment or modification must be in writing and signed by both parties. These provisions in a contract can be waived.

The Letter Agreements as amended between [Carlton] and CBM contains a non-waiver clause (Paragraph 16g). This provision in a contract may be waived.

Waiver is an intentional surrender of a known right or intentional conduct inconsistent with claiming the right. Silence or inaction, for so long a period to show an intention to yield the known right, is also enough to prove waiver. If those provisions are waived, the parties may orally agree to other provisions. In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Phillips and EurEnergy did not object to these instructions and do not complain about them on appeal. When there has been no objection to the court's charge, we assess the legal sufficiency of the evidence according to the instructions given by the trial court to the jury. *Osterberg v. Peca,* 12 S.W.3d 31, 55 (Tex.2000).

■ The evidence supports the jury's implied finding that CBM had waived the no-oral-modification clause and non-waiver clause in the CBM/Carlton agreement. Carlton presented ample evidence that CBM accepted the first tranche, even though the $300,000 cash payment was made subject to certain restrictions, including the restriction that Scholz be provided an additional period of days to review well logs. The evidence also supports the jury's finding that Carlton and CBM had agreed that Carlton's second tranche of funding could be made within 90 days of the funding of the first tranche or 30 days after receipt of the well logs, whichever date was later.

Carlton also presented evidence that CBM had failed to comply with the CBM/Carlton agreement when, after accepting the first tranche and after modifying the timing requirement for the second tranche, CBM declared Carlton in default and sought to "replace" Carlton with EurEnergy. And Carlton presented evidence that Phillips and EurEnergy intentionally interfered with the CBM/Carlton agreement and neither Phillips nor EurEnergy had a good faith belief that they had a right to do so.

■ On August 23, 2004, Phillips signed the Carlton/Phillips agreement under which Phillips, in exchange for $8.5 million, would acquire a 10% interest in the Bulgaria Project. Phillips, in an addendum that was subsequently agreed to by Carlton, requested 30 days to review documents and "technical information" and the right to withdraw. In September 2004, Phillips met with Carlton representatives to review some of this information, and the jury was presented evidence that would have entitled it to reasonably conclude that Carlton had shared information with Phillips during the fall of 2004 pursuant to the Carlton/Phillips agreement. The jury was also presented with evidence that, during this same time frame, and unbeknownst to Carlton, Phillips had acquired from Dr. Henry Crichlow, a registered professional engineer, two reports on the Bulgaria Project.

In a June 28, 2004 memorandum report on the "Bulgaria Coalbed Methane (CBM) Project," Dr. Crichlow suggested that the Bulgaria Project was a "valuable interna-

tional prospect." And, in his second report, an October 11, 2004 "interim due-diligence report on the 108,000 acre Coal Bed Methane Project in ... Bulgaria for Mr. Gene Phillips et al," Crichlow encouraged Phillips to send Carlton a withdrawal letter and obtain "[l]egal advice ... regarding the supplanting of the Carlton Energy position with the Phillips Group under the same 48% interest position" held by Carlton. Crichlow, who had met with the principals of Raven Ridge Resources ("RRR"), a consulting company involved in energy resource assessment, to discuss the "administrative, commercial, political, engineering and operational aspects" of the Bulgaria Project, urged that,

> A partnership with CBM is highly recommended considering the quality and experience of the ownership and management. RRR and CBM have been involved in this project for over six years. It is very unusual to have the amount of data available for a project of this type and the extreme enthusiasm for success that was expressed by the principals of such a highly respected industry leader such as Raven Ridge Resources. These factors greatly reduce the investment risk in this type of project.

Crichlow also suggested that any deal directly between CBM and Phillips "be based on CBM declaring Carlton in default of their original contract." Crichlow cautioned that "[c]are should be taken" to avoid "potential Phillips Group liability for 'tortious interference' directed at Phillips [ ] for the termination of the contract between CBM and Carlton." From this evidence, the jury could have reasonably concluded that Phillips willfully planned to cut Carlton out of what all the parties believed at the time to be an extremely lucrative deal.

Carlton also presented evidence that Phillips, in the fall of 2004, had direct contact with CBM, and substantial documentary evidence reveals that he, as early as October 2004, was contemplating a "possible cash settlement" with Carlton in an effort to remove it from any involvement in the Bulgaria Project. Notes and documents that were obtained from CBM and introduced into evidence also reveal that Phillips, during this time frame, had provided CBM with assurances that he would support CBM in potential litigation involving Carlton. CBM's lawyer testified at trial that he was "concerned" that the direct negotiations between Phillips and CBM could have been interfering with the contract between Carlton and Phillips. In November 2004, CBM's lawyer specifically asked Phillips if there was a contract between Phillips and Carlton, and, according to these documents, Phillips represented that they had no contract. Also, in November 2004, CBM's lawyer sent to a Phillips-related entity a letter in which he detailed the competing interests in the Bulgaria Project. In regard to the "current relationship with Carlton," CBM stated that it and the Phillips-related entity needed to "establish a joint position on any position Carlton may have, and whether it's advantageous to approach Carlton to either return its partial funding to date (including replacing the letter of credit) and perhaps allocating some consideration to Carlton for its partial performance to date." CBM also noted that the Phillips-related entity had advised CBM that it would "support (including financially) CBM in any possible dispute which may arise of out of Carlton's misinterpretation of its position" in the Bulgaria Project. Thus, the jury was presented with evidence that both Phillips and CBM were pursuing a course of action for which they anticipated the possibility of legal liability to Carlton.

On December 3, 2004, at the same time that Phillips was in direct contact with CBM about the Bulgaria Project, Phillips sent Carlton a letter in which he represented that he had not been aware that Carlton faced "time constraints" in regard to the Bulgaria Project, but because of these "tight time constraints," he was unable to make a determination to participate in this venture and he declined "to go forward with any proposed transaction" with Carlton. Despite Phillips's representations in his withdrawal letter, Phillips and CBM continued their direct negotiations, which included their shared "handling" of what they referred to as the Carlton "situation." A Phillips representative stated in a December 2004 e-mail to CBM that "it would not be prudent for Gene [Phillips] to immediately get involved until they [Carlton] have been called into default." From these communications and the documentary evidence, the jury could have reasonably inferred that not only did Phillips intentionally breach the Carlton/Phillips agreement but also that Phillips and CBM willfully planned to remove Carlton from any involvement in the Bulgaria Project and for Phillips, or a Phillips-related entity, to supplant Carlton.

Finally, we note that the evidence reveals that in the beginning of 2005, R.N. Real Estate, a Phillips-related entity, formed EurEnergy, a wholly owned subsidiary. Shortly thereafter, in February 2005, EurEnergy and CBM executed a letter agreement and the CBM/EurEnergy JDA, both of which demonstrated that CBM had agreed to declare Carlton in default of the CBM/Carlton agreement and EurEnergy had agreed to indemnify CBM for any legal liability to Carlton.

In sum, Carlton presented ample evidence supporting the jury's findings in regard to Carlton's tortious-interference claim. Viewing the evidence in the light most favorable to the jury's findings, we conclude that the jury could have reasonably found that Carlton complied with the provision in the CBM/Carlton agreement requiring Carlton to actually fund the first tranche, Carlton and CBM agreed to the modification of their agreement in regard to the timing of the second tranche, CBM failed to comply with the CBM/Carlton agreement, Phillips and EurEnergy intentionally interfered with the CBM/Carlton agreement, and neither Phillips nor EurEnergy had a good-faith belief that it had the right to interfere with the CBM/Carlton agreement. We further conclude that the evidence supporting these findings is not so weak as to render the jury's verdict clearly wrong and manifestly unjust. Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's liability findings on Carlton's tortious-interference claim.

We overrule Phillips and EurEnergy's second issue.[4]

## Actual Damages

In their first issue in their cross-appeal, Phillips and EurEnergy argue that the evidence is legally and factually insufficient to support the trial court's award of $31.16 million in actual damages because determining the fair market value of Carlton's interest in the Bulgaria Project in-

---

4. Having held that the evidence is legally and factually sufficient to support the jury's findings on Carlton's tortious-interference claim, we need not consider Phillips and EurEnergy's fifth issue, in which they contend that the evidence is legally and factually insufficient to support the trial court's finding that Carlton would have been entitled to attorney's fees on its breach-of-contract claim. Although the trial court made such a finding, it did not award Carlton its attorney's fees because it entered judgment on Carlton's tortious-interference claim and awarded Carlton actual and exemplary damages on that claim.

volved "a specialized field outside [the] jurors' knowledge" and the testimony of Carlton's expert, who utilized unreliable foundational data, amounted to "conjecture and speculation." Within their legal-sufficiency challenge, Phillips and EurEnergy attack the two valuation models used by Carlton's expert. Alternatively, Phillips and EurEnergy argue that the evidence is factually insufficient to support an award of damages any "greater than the 5.4% of the [Bulgaria Project's] market value" because Carlton was only able to conditionally fund $899,990 and "there is no evidence that Carlton would have obtained" the required $8 million in "funding from any other source."

In its first issue in its appeal, Carlton argues that the trial court erred in "suggesting a remittitur to $31.16 million in actual damages" because "factually sufficient evidence supports the jury's finding of actual damages of $66.5 million or, alternatively, at least $38 million." Carlton asserts that the evidence presented supports "three possible damages awards": (1) a review of all the evidence supports the jury award of $66.5 million, (2) "a calculation by Carlton's damages expert, Pete Huddleston, using a conventional cash-flow model, or 'max/min' analysis, supports a damages award of $38 million," and (3) "an alternative calculation by Huddleston using a 'comparable sale' approach supports the award of $31.16 million."

As noted above, in conducting a legal-sufficiency review of the evidence, we must consider all of the evidence in the light most favorable to the jury's award and indulge every reasonable inference that would support it; we must consider evidence favorable to the jury's findings if a reasonable fact-finder could consider it, and disregard evidence contrary to the finding unless a reasonable fact-finder could not disregard it. *City of Keller*, 168

S.W.3d at 827; *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex.App.-Houston [1st Dist.] 2007, no pet.). When considering a party's assertion that unreliable scientific evidence or expert testimony is legally insufficient to support a verdict, we independently consider whether the evidence at trial would enable reasonable and fair-minded jurors to reach the verdict. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex.2009) (citing *City of Keller*, 168 S.W.3d at 827). Such a review "encompasses the entire record, including contrary evidence tending to show the expert opinion is incompetent or unreliable." *Id.* Conclusory or speculative expert opinion testimony is not relevant evidence because it does not tend to make the existence of material facts more probable or less probable. *See* Tex.R. Evid. 401; *Whirlpool Corp.*, 298 S.W.3d at 637. We are to "rigorously examine the validity of facts and assumptions" of an expert's opinion "as well as the principles, research, and methodology underlying the expert's conclusions." *Whirlpool Corp.*, 298 S.W.3d at 637.

In reviewing the trial court's remittitur, we must determine whether factually-sufficient evidence supports the jury's award. *Bentley v. Bunton*, 94 S.W.3d 561, 620 (Tex.2002); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). In conducting our factual-sufficiency review, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury. *Mar. Overseas Corp.*, 971 S.W.2d at 407. Because Carlton, not Phillips and EurEnergy, had the burden to prove its damages at trial, a remittitur of the jury's damages award should not have been required unless the evidence supporting the award is so weak that the jury's award is clearly wrong and manifestly unjust. *See id.; Cain*, 709 S.W.2d at 176. If we sustain Carlton's

challenge that the trial court should not have required the remittitur, we must render the judgment that the trial court should have rendered. *See* TEX.R.APP. P. 46.2.

In making its determination of what sum of money would fairly and reasonably compensate Carlton for its damages caused by the tortious interference with the CBM/Carlton agreement, the trial court instructed the jury to consider the fair market value of Carlton's interest in the Bulgaria Project at the time of the interference, and it defined fair market value as:

> ... the amount that would be paid by a knowledgeable buyer who desires to buy but is not required to buy, to a knowledgeable seller, who desires to sell but is under no necessity of selling.[5]

Carlton, in regard to its tortious-interference claim, sought damages for the fair-market value of its 38% interest in the Bulgaria Project, which was to be measured at the time that it was deprived of its interest as a result of the tortious interference. We first address Phillips and EurEnergy's argument that Carlton may not recover actual damages totaling more than the fair market value of a 5.4% interest in the Bulgaria Project because Carlton did not present evidence that it would have obtained the money necessary to fulfill its funding obligations under the CBM/Carlton agreement. The argument ignores the fact that Phillips, pursuant to the Carlton/Phillips agreement, was to pay Carlton $8.5 million in exchange for a 10% interest in the Bulgaria Project. This would have enabled Carlton to fulfill its funding obligations and entitled it to obtain its 38% interest in the Bulgaria Project. As dis-cussed below, the jury found that not only did Phillips and EurEnergy tortiously interfere with the CBM/Carlton agreement, but also that Phillips failed to comply with the Carlton/Phillips agreement. And, as we hold below, the jury's finding that Phillips failed to comply with the Carlton/Phillips agreement is supported by legally- and factually-sufficient evidence.

As evidence of the fair market value of its 38% interest in the Bulgaria Project, Carlton presented the expert testimony of Huddleston and Dr. Crichlow. Dr. Crichlow testified that he obtained his doctorate in petroleum engineering from Stanford University and had previously served as a professor of engineering and the head of the Department of Petroleum Natural Gas and Geological Engineering at the University of Oklahoma. His company, HBC Registered Professional Engineers, is involved in reserve evaluations of major oil fields, and he had previously worked for the World Bank in evaluating the reserves for the country of Bolivia in order to justify the construction of a pipeline from Bolivia to Brazil and Argentina. Crichlow had also worked with the country of Kuwait "to decide which wells should be looked at first" to ensure "minimal loss of resources" as a result of the Kuwaiti oilfield fires in 1991. He had also worked for the United States Federal Deposit Insurance Corporation to evaluate 29,000 oil and gas reserves packages that were being held by banks. And, Crichlow is the author of a book titled, *Modern Reservoir Engineering—A Simulation Approach.*

In his June 28, 2004 memorandum report, Dr. Crichlow explained that he had reviewed the Bulgaria Project, his recommendations were "favorable," the Bulgaria

---

**5.** *See, e.g., Dupont Emps. Recreation Ass'n v. A.V.A. Servs., Inc.,* No. 01–04–00053–CV, 2005 WL 1118043, at *4 (Tex.App.-Houston [1st Dist.] May 12, 2005, no pet.). On appeal, neither party complains about the damages question or associated instructions and definitions.

Project had "several highly desirable characteristics," and the detailed characteristics made the project a "valuable international project." He discussed the Bulgaria Project's geology, resource base, economics, gas valuation, and regulatory requirements. And Crichlow emphasized the Bulgaria Project's existing exploratory drilling, "relatively shallow depth," "excellent economics," and "pipeline availability." In a section of his report entitled "Gas Valuation," Crichlow provided detailed estimates of the amount of gas in place and the value of the gas in the ground for both a 100% and a 1% interest in the Bulgaria Project. In regard to the valuation of a 100% interest, Crichlow estimated that there was 35,000 billion cubic feet of gas in place, a 90% recoverability factor, a gas price of $1 per MMBTU (or one million British Thermal Units), and a "gas valuation in ground" of "$31.5 billion U.S." Crichlow estimated that a 1% interest concerning 350 billion cubic feet of gas in place, with a 90% recoverability factor and a "gas price in ground" of $1 per MMBTU, would result in a "gas valuation in ground" of "$315 million US."

In his October 11, 2004 "interim due-diligence report" prepared "for Mr. Gene Phillips et al," Dr. Crichlow, who had met with the principals of RRR about the Bulgaria Project, issued his findings, conclusions, and recommendations. He issued findings on various aspects of the Bulgaria Project, including "Commercial, Administrative, and Political" as well as "Engineering and Operational." Crichlow also summarized CBM's exploration and prospecting programs. And he emphasized that it was "very unusual to have the amount of data available for a project of this type," the Bulgaria Project had a "greatly reduce[d] ... investment risk," and it had a "[b]illion dollar profit potential." Thus, Crichlow "highly recommended" that Phillips enter into a partnership with CBM and a Phillips-related entity supplant Carlton's position in the Bulgaria Project. He concluded that a "successful partnership with CBM that includes the anticipated cash flow from gas production, should allow the reinvestment in Bulgaria to compound the returns to [Phillips] many times over."

Huddleston, a registered professional engineer and the principal of Huddleston & Company, a consulting firm of petroleum and geological engineers, testified that he was involved in oil and gas consulting, exploration, and production. He noted that his company has worked for over 500 companies, including "every major oil company" and most "large independents." It had also been retained on a major project for the United Nations to assess the losses to oil and gas reserves as a result of Operation Desert Storm. Huddleston explained that he has been "involved in virtually every phase" of "upstream activities," including exploration and development of prospects; his company has been involved in "several billion dollars of consulting on buy-sell projects"; he has furnished reports to the United States Securities and Exchange Commission and public companies; and he has been involved in project analysis, including the estimation of reserves for transmission lines in the United States. Huddleston, who analyzes approximately 200 projects annually, taught two senior engineering courses—petroleum management and petroleum investment analysis—at Texas A & M University from 1981 to 1998. He had also prepared manuals that were used by the petroleum schools at the University of Texas and Louisiana State University. Huddleston noted that he has published in excess of 300 papers on oil and gas topics and made presentations for multiple organizations, including the Society of Petroleum Evalua-

tion Engineers and the Texas Bar Association.

■ In his testimony to the jury regarding the fair market value of Carlton's interest in the Bulgaria Project at the time of Phillips and EurEnergy's tortious interference with the Carlton/CBM agreement, Huddleston generally explained two possible damage models: (1) the "most likely" model and (2) the "cash flow" or "min/max" model. In calculating a valuation using the "most likely" damages model, Huddleston explained that he primarily considered the value of the Carlton/Phillips agreement. Because Phillips himself had agreed to pay Carlton $8.5 million for a 10% working interest in the Bulgaria Project, Huddleston explained that the total value of the Bulgaria Project at the time of the tortious interference could be calculated to have been approximately $85 million and, after the subtraction of well costs, the net market value of the Bulgaria Project could be calculated to have been approximately $82 million. Thus, using the amount that Phillips himself had agreed to

pay for a 10% working interest in the Bulgaria Project, Huddleston opined that the approximate fair market value of a 38% interest in the Bulgaria Project at the time of the tortious interference could be calculated to have been at least approximately $31 million. Huddleston also explained that he considered the value of the February 2005 CBM/EurEnergy JDA when opining on the value of what would have been Carlton's remaining 38% interest in the Bulgaria Project. Although Huddleston agreed that the CBM/EurEnergy JDA was "more complicated" and "confusing," he explained that this separate agreement could serve to at least confirm, "to some extent," that his valuation of the Carlton/Phillips agreement was "probably" reasonable.[6]

In regard to the "cash flow" or "min/max" model, Huddleston explained that he derived an approximate range of fair market values based upon reserve reports and other documents prepared by Dr. Crichlow, whose services had been obtained by Phillips.[7] Huddleston char-

**6.** Phillips and EurEnergy argue that Huddleston, and the jury, were not entitled to consider the value expressed in the Carlton/Phillips agreement because the agreement was ultimately never consummated. However, the fact that a contract is unconsummated does not necessarily deprive that contract of evidentiary value when determining the fair market value of the interest at issue. *See Nelson v. Najm*, 127 S.W.3d 170, 177 (Tex. App.-Houston [1st Dist.] 2003, pet. denied); *Moore v. Bank Midwest, N.A.*, 39 S.W.3d 395, 400 (Tex.App.-Houston [1st Dist.] 2001, pet. denied); *State v. Clevenger*, 384 S.W.2d 207, 209–10 (Tex.Civ.App.-Houston 1964, writ ref'd n.r.e.); *Robards v. State*, 285 S.W.2d 247, 249 (Tex.Civ.App.-Austin 1955, writ ref'd n.r.e.). Moreover, the jury found that Phillips failed to comply with the Carlton/Phillips agreement.

Phillips and EurEnergy also argue that the Carlton/Phillips agreement should not have been used by Huddleston because, when

Phillips signed the letter agreement with Carlton, he "did not have knowledge of all the facts," including the technical information that he referenced in his addendum. However, the evidence supports an implied finding that Phillips contracted with Carlton and did not timely withdraw after he had obtained more information on the Bulgaria Project. Indeed, as outlined above, Carlton presented evidence that Phillips, during this time frame, had obtained the services of Dr. Crichlow, had been in direct contact with CBM, and was working to reach an agreement with CBM and exclude Carlton from the Bulgaria Project.

**7.** Phillips and EurEnergy cite conflicting evidence as to whether Dr. Crichlow actually worked for Phillips at any time throughout the parties' dealings, but the jury was free to resolve any conflicts and conclude that he, at some point, was acting for Phillips. Indeed, Crichlow, in his October 11, 2004 "interim due diligence report" prepared "for Mr. Gene

acterized Crichlow's reserve report as "extremely good." And Crichlow, in his deposition, which was introduced into evidence, explained that his report was "reliable." Using the information contained in Crichlow's reports, Huddleston opined that the fair market value of the Bulgaria Project at the time of the tortious interference could have been between "in excess" of $100 million and a minimum of "roughly 32 million, or something like that." When asked to derive "the most likely between these two" figures, Huddleston cautioned that it was more appropriate to provide the jury with a possible range of values rather than a specific number, noting that the jury could consider all of the evidence in determining the fair market value of Carlton's 38% interest in the project at the time of the tortious interference.

The jury awarded Carlton for its actual damages $66.5 million, which exceeded the general approximate range of fair market values suggested by Huddleston under both his "most-likely" and "cash-flow" models for Carlton's 38% interest in the Bulgaria Project. However, the jury's award of $66.5 million is not rendered legally or factually insufficient simply because it exceeded the range of values suggested by Huddleston. *See City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 73 (Tex. 2000) ("A jury may award more damages than requested by a party if there is evidence supporting the higher award of damages."). And we are not compelled to affirm the trial court's remittitur simply because Carlton's counsel, in closing argument, suggested that the jury award actual damages of $31.16 million. Rather, our duty on appeal is to instead determine whether the record evidence, including, but not limited solely to Huddleston's expert opinion testimony, is legally and factually sufficient to support the jury's award.

Again, in conducting our legal-sufficiency review, we consider all of the evidence in the light most favorable to the jury's award and indulge "every reasonable inference" that would support it, and we "must consider all evidence favorable" to the jury's award if a reasonable fact-finder could. *City of Keller*, 168 S.W.3d at 827. In regard to our factual-sufficiency review of the trial court's remittitur, we again note that a trial court may not substitute its judgment for that of the jury and may require a remittitur only if the evidence suggesting the award is so weak that the jury's award is clearly wrong and manifestly unjust. *See Mar. Overseas Corp.*, 971 S.W.2d at 406; *Cain*, 709 S.W.2d at 176.

In calculating the fair market value of Carlton's 38% interest in the Bulgaria Project at the time of the tortious interference and awarding Carlton $66.5 million, the jury had before it not only Huddleston's expert opinions and methodologies, but also the underlying data and information obtained by Dr. Crichlow regarding the Bulgaria Project. As noted above, Crichlow, in regard to the valuation of a 100% interest, estimated that there was 35,000

Phillips et al," recommended to Phillips that a Phillips entity "supplant" Carlton in the Bulgaria Project.

Phillips and EurEnergy also assert that Dr. Crichlow's initial June 2004 report was nothing more than a "sales pitch" prepared for D.W. Mitchell and not Phillips. To the extent there is evidence to suggest that Crichlow prepared his first report for the pur-

pose of meeting with other possible investors, this fact could have been considered by the jury in weighing the evidence. Moreover, we note that Crichlow consistently testified that he knew that potential investors would be relying upon the information he prepared, in his capacity as a professional engineer, for decision-making purposes.

billion cubic feet of gas in place, a 90% recoverability factor, and a "gas price in ground" of $1 per MMBTU, resulting in a "gas valuation in ground" of "$31.5 billion U.S." For a 1% interest, Crichlow estimated a "gas valuation in ground" of "$315 million U.S." In his testimony, Huddleston explained that the $1 per MMBTU figure used by Crichlow was a reasonable price. And Huddleston supported his testimony by referring to *Institutional Investor* magazine, which "covers monthly all of the oil and gas transaction activity certainly in the United States and Canada; and they commonly report transactions that people are making, probably average a billion a month or something, of what they paid for reserves in the ground." From Huddleston's testimony on this subject, the jury could have reasonably concluded that, based on industry practice, Crichlow's estimates reflected a reasonable market price for the Bulgaria Project's gas in the ground. Huddleston, in discussing general recoverability rates, explained that "[t]ypical coalbed recoveries probably range from a low of 70% maybe to 85%." From this evidence, the jury could have reasonably concluded that a lower recoverability rate than the 90% recoverability rate used by Crichlow could provide a more conservative guide to evaluate the fair market value of the project. Huddleston further testified that Crichlow's June 2004 report did "have economics to it," and the jury could have reasonably concluded that the estimates used by Crichlow in valuing the Bulgaria Project's gas in the ground took into account many of the market variables that Phillips and EurEnergy identify on appeal. Finally, when asked if "valuing gas in the ground" is "one of the ways in which" an investor could determine whether "to do a project," Huddleston agreed that this could be used "as an approximate early on."

Moreover, we note that in attacking Carlton's expert evidence and underlying data on actual damages, Phillips and EurEnergy, in the trial court below, did not present the jury with any contradictory evidence that the jury could not have disregarded. *See City of Keller,* 168 S.W.3d at 827. Nor did they present any expert testimony of their own to suggest a lesser, alternative fair market value of Carlton's interest in the Bulgaria Project. Rather, Phillips and EurEnergy's primary contention was that, regardless of liability, which they vigorously challenged, Carlton was not entitled to recover anything for its lost interest. Nor, in their cross-appeal in this Court, do Phillips and EurEnergy cite us to any record evidence establishing that it would have been inherently unreasonable for the jury to have relied upon Carlton's expert evidence or the underlying data in determining the fair market value of its interest in the Bulgaria Project. Specifically, we note that there is nothing in the record to establish that it would have been inherently unreasonable for the jury, in assessing the fair market value of Carlton's interest at the time of Phillips and EurEnergy's tortious interference, to have placed great weight on Dr. Crichlow's unchallenged data regarding the value of a mere 1% interest in the Bulgaria Project's gas in the ground. Huddleston, in regard to the "cash flow" or "min/max" models, explained the importance of gas reserves, and he further testified that an investor in this type of project should consider and weigh certain information and data in determining whether and how much to invest. And, rather than giving the jury a specific fair market value of Carlton's interest, he testified that the jury, in making its own assessment, could consider a range of values as well as the pertinent information and data. Indeed, assessing the fair market value of Carlton's interest in the project was the jury's job as fact finder,

and nothing precluded it from placing great weight upon the value of the Bulgaria Project's gas in the ground. And Phillips and EurEnergy have not presented us with either established facts or law that logically undermines the jury's finding of actual damages in this case.

■ In sum, the jury could have placed great weight on Dr. Crichlow's evidence, including his data on the value of the Bulgaria Project's gas in the ground, and, from it, the jury could have logically deduced that the fair market value of Carlton's interest in the Bulgaria Project significantly exceeded the range of values proposed by Huddleston in both of his damages models. The jury was presented with evidence that, in determining the fair market value of Carlton's 38% interest in the Bulgaria Project, it could consider the valuation of its gas reserves. Dr. Crichlow, in his June 28, 2004 memorandum report, which was introduced into evidence without objection, valued a mere 1% interest in the Bulgaria Project's gas "in ground" at $315 million. In this same report, Crichlow estimated a 90% recoverability rate, although the jury also heard testimony from Huddleston that would support applying a more conservative recoverability rate than that applied by Crichlow.

Moreover, the jury could have reasonably believed that Phillips himself had tremendous confidence in Dr. Crichlow's data,

conclusions, and recommendations. After agreeing on August 23, 2004 to pay Carlton $8.5 million for a 10% interest in the Bulgaria Project, Phillips obtained Crichlow's October 11, 2004 interim due diligence report. In the report, Crichlow explained, "It is very unusual to have the amount of data available for a project of this type and the extreme enthusiasm for success that was expressed by the principals of such a highly respected industry leader such as Raven Ridge Resources." Noting that the pertinent factors "greatly reduce[d] the investment risk in this type of project" and the Bulgaria Project had a "[b]illion dollar proft potential," which would "compound the returns to [Phillips] many times over," Crichlow "highly recommended" that Phillips enter a "partnership" with CBM. Thus, the jury had before it evidence that Phillips himself so highly valued Carlton's interest in the Bulgaria Project that he was willing to breach the Carlton/Phillips agreement and supplant Carlton's interest by forming his own partnership with CBM.

Although there is nothing in the record to directly set forth how the jury arrived at its damages award of $66.5 million, we conclude that the jury's damage award is amply supported by Huddleston's testimony, the detailed information contained in Dr. Crichlow's reports, and the other substantial testimonial and documentary evidence introduced at trial.[8] *See State v. Harrell Ranch, Ltd.,* 268 S.W.3d 247, 258

---

8. Carlton asserts that the jury, using Dr. Crichlow's value of a 1% interest, not a 100% interest, in the Bulgaria Coalbed Methane Project's gas in the ground, may have based its fair market valuation of Carlton's 38% interest on the following formula:

> Dr. Crichlow put the amount of gas at 350 billion cubic feet (BCF). He put its recoverability at 90%. The jury conservatively discounted Dr. Crichlow's 90% to 50%. This cut the 350 BCF of gas in half, to 175 BCF in recoverable gas. Carlton's 38%

share of that 175 BCF is 66.5 BCF. That calculation provides a damages finding of $66.5 million, using the standard conversion factor of 1 million MMBTU (million British Thermal Units) per BCF and a price of $1 per MMBTU. Thus, the jury's finding flows directly from the reports by Phillips's hand picked engineering professor and "world renowned expert [Dr. Crichlow]." And under his evidence, the jury award actually could have been much higher.

(Tex.App.-Austin 2008, no pet.) (acknowledging that there was "nothing in the record to inform" court of jury's reasoning in awarding damages for diminution of value, which exceeded proposed damage figures, but holding that "[g]iven [the] possible applications of the evidence, the jury award" fell within the "range of evidence" and was not "excessive").

Phillips and EurEnergy make additional arguments in attacking the sufficiency of the evidence to support the jury's award of $66.5 million, or the award of any actual damages. In arguing that Huddleston's expert testimony constitutes no evidence, Phillips and EurEnergy cite *Ramco Oil & Gas Ltd. v. Anglo–Dutch (Tenge) L.L.C.,* 207 S.W.3d 801 (Tex.App.-Houston [14th Dist.] 2006, pet. denied). In *Ramco,* the court held that there was "no evidence to prove with reasonable certainty" the claimed lost profits because the proof of lost profits was "largely speculative, dependent on uncertain and changing market conditions, and based on risky business opportunities and the success of an unproven enterprise." *Id.* This, however, is not a lost-profits case.

Carlton sought to recover damages for the loss of its 38% interest in the Bulgaria Project, measured at the time that Phillips and EurEnergy tortiously interfered with the CBM/Carlton agreement. Carlton claims, and the jury concluded, that Phillips essentially appropriated Carlton's interest, which was an asset that had a market value at the time it was taken. Texas courts have long recognized, in circumstances that are similar to those presented here, that a plaintiff may seek to recover the market value of a lost asset. *See Humble Oil & Refining Co. v. Kishi,* 276 S.W. 190, 191 (Tex. Comm'n App.1925, judgm't adopted), reh'g granted, 291 S.W. 538 (Tex. Comm'n App.1927, holding approved) (providing for recovery for market

value of lost right to leasehold interest). Other courts have also recognized that, in certain circumstances, a plaintiff may seek to recover damages for the market value of an asset rather than lost profits. *See Schonfeld v. Hilliard,* 218 F.3d 164, 177 (2nd Cir.2000) (stating that "market value of an income-producing asset is inherently less speculative than lost profits because it is determined at a single point in time" and "represents what a buyer is willing to pay for the chance to earn the speculative profits").

Of course, any investment of capital made to obtain an interest in a speculative venture involves risk, especially if the decision to make the investment can be made on nothing more than estimates. However, this simple fact of business life does not mean that such an interest has no market value. Nor does it preclude a fact-finder, utilizing pertinent data and factors, from determining the fair market value of the interest. Such determinations, often involving millions and sometimes billions of dollars, are made every day by businesses in a free market economy. As explained by Huddleston, it is "very common" for interests in ventures such as the Bulgaria Project to be bought and sold before there is any production from the venture. He also noted that he considered the Bulgaria Project to be "viable" and that his company "would [have] definitely consider[ed]" investing in it.

Here, Carlton introduced evidence to support the jury's findings that Phillips and EurEnergy tortiously interfered with its rights under the CBM/Carlton agreement and Carlton was deprived of its 38% interest in the Bulgaria Project as a result of the tortious interference. Under Texas law, Carlton was entitled to seek and recover, as a proper measure of its damages, the fair market value of its interest at the time of the tortious interference. *See*

*Humble Oil & Refining Co.*, 276 S.W. at 191. Carlton presented both expert testimony and documentary evidence, containing pertinent data and information, to support a broad range of values for the jury to consider in determining the fair market value of Carlton's interest. Thus, Carlton was not required to prove any ultimate "lost profits" to recover actual damages caused by Phillips and EurEnergy's tortious interference.[9]

Phillips and EurEnergy also assert that Huddleston's damage models are too speculative to provide any evidence of damages, citing *City of Harlingen v. Estate of Sharboneau,* 48 S.W.3d 177 (Tex.2001). In *Sharboneau,* the Texas Supreme Court determined that an expert's testimony on the fair market value of a piece of undeveloped real property was not competent. *Id.* at 185. The court noted that the expert's methodology required "more than a dozen analytical steps, most involving assumptions and estimates" and "fail[ed] to account for basic marketplace realities," including marketplace characteristics, "unexpected competition," political forces, "economic stagnation," and "other risks." *Id.* at 184–85.

Although Huddleston's testimony could be viewed as somewhat conflicting, he did provide the jury with two damage models to consider and an explanation of Dr. Crichlow's data and estimates of the value of the Bulgaria Project's gas in the ground. Again, Phillips himself, on August 23, 2004, had offered to pay Carlton $8.5 million for a 10% interest in the Bulgaria Project. And, again, Crichlow, after consulting with the principals of RRR and performing a detailed due diligence study of the Bulgaria Project for Phillips, not only concluded that it was a "viable international project" with a "[b]illion dollar profit potential," but even encouraged Phillips to obtain "[l]egal advice ... regarding the supplanting of the [Carlton] position with the Phillips Group under the same 48% interest position [that would have been held by Carlton] in the CBM Project." He noted the Bulgaria Project's geology, resource base, economics, and regulatory requirements, which "greatly reduce[d] the investment risk for this type of project." And, he based his calculation on the Bulgaria Project's exploratory drilling, "relatively shallow depth," "excellent economics," and "pipeline availability." Huddleston also explained that the $1 per MMBTU used by Crichlow was a reasonable price supported by his reference to *Institutional Investor* magazine.

The bottom line is that it was the jury's job, as fact finder, after considering Huddleston's testimony, Crichlow's report, and the other documentary evidence, to determine the fair market value of Carlton's interest in the Bulgaria Project at the time of Phillips and EurEnergy's tortious interference with the Carlton/CBM agreement. In doing so, it, based upon Huddleston's testimony and Dr. Crichlow's reports, could have reasonably concluded that one way an investor in the marketplace could

---

**9.** Phillips and EurEnergy also argue that Carlton could not seek to recover the market value of its interest because the Bulgaria Project was ultimately a failure. However, this is precisely why Carlton sought to recover damages measured by the fair market value of its interest at the time that Carlton was deprived of it rather than on any future lost profits.

Phillips and EurEnergy also complain that Carlton failed to present evidence of any other willing buyers in the market. This complaint ignores the fact that Phillips himself was such a willing buyer. The necessary implication of Huddleston's testimony is that Carlton's interest in the Bulgaria Project had a market value that was subject to calculation based upon various factors, which he left to the jury to weigh and ultimately determine.

conservatively place a fair market value on Carlton's interest in the Bulgaria Project would be to seriously consider the project's estimated gas reserves in the ground and the recovery rate and value of those gas reserves. It was free to place great weight upon Crichlow's estimates and then discount them based on a more conservative recoverability rate and other pertinent factors. And the jury could have reasonably concluded, based upon Huddleston's testimony, Crichlow's testimony, and the data and information in Crichlow's reports, as well as the documentary evidence, that economic and marketplace factors were used in determining the approximate values of the estimated gas reserves.

Viewing the evidence in the light most favorable to the jury's award, we conclude that the jury could have reasonably found that the fair market value of Carlton's interest in the Bulgaria Project at the time that Phillips and EurEnergy tortiously interfered with the CBM/Carlton agreement was at least $66.5 million. We further conclude that the evidence that supports the award is not so weak as to render the jury's award clearly wrong and manifestly unjust. Accordingly, we hold that the evidence is legally and factually sufficient to support the actual damages awarded by the jury and the trial court erred in requiring a remittitur of Carlton's actual damages from $66.5 million to $31.16 million.

We sustain Carlton's first issue in its appeal, and we overrule Phillips and EurEnergy's first issue in their cross-appeal.

## Breach of Contract

Normally, having overruled Phillips and EurEnergy's second issue, we would not consider their fourth issue, in which they argue that the evidence is legally and factually insufficient to support the jury's finding that Phillips breached the Carl-ton/Phillips agreement because Carlton never accepted Phillips's "counteroffer." Here, however, as noted above, Phillips and EurEnergy have argued that Carlton may not recover actual damages totaling more than a fair market value of a 5.4% interest in the Bulgaria Project because Carlton did not present evidence that it could have fulfilled its funding obligations to obtain a 38% interest in the project. Thus, Phillip and EurEnergy's actual-damages issue is linked to its fourth issue, and we, therefore, address it. Within their fourth issue, Phillips and EurEnergy also assert that the trial court did not instruct the jury on the proper elements of a breach-of-contract claim, and they also attack the jury's finding that Phillips's failure to comply was not excused.

 Phillips agrees that he signed the Carlton/Phillips agreement on August 23, 2004 with an addendum providing that he be given a 30-day period to review technical information. O'Dell testified that he, on behalf of Carlton, signed the agreement with this addendum shortly thereafter. It is undisputed that Phillips and Carlton representatives met on September 7, 2004, and Carlton presented evidence that at this meeting, and thereafter, Carlton shared technical and other information with Phillips regarding the Bulgaria Project. Thus, sufficient evidence supports the jury's findings that Carlton and Phillips formed an agreement and Carlton agreed to the terms of the Carlton/Phillips agreement, including the addendum, before Carlton received Phillips's December 3, 2004 letter attempting to withdraw from the Carlton/Phillips agreement.

Although Phillips and EurEnergy complain that Carlton never returned to Phillips a fully executed copy of the Carlton/Phillips agreement, O'Dell testified that he did execute the agreement shortly after receiving it from Phillips and, pursu-

ant to ordinary procedures, Carlton would have sent a return copy to Phillips. Additionally, the jury's implied finding that the parties had engaged in conduct in furtherance of the Carlton/Phillips agreement is supported by the evidence. Under these circumstances, there is no requirement for Carlton to have returned a copy of the agreement in order for the jury to have found it to be valid and enforceable. *See DeClaire v. G & B McIntosh Family Ltd. P'ship*, 260 S.W.3d 34, 44 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (stating that "if one party signs, the other may accept by his acts, conduct, or acquiescence in the terms of the contract"). This evidence also supports the jury's finding that Phillips did not send his December 3, 2004 letter attempting to withdraw from the Carlton/Phillips agreement in compliance with the addendum. Again, as noted above, the jury was presented with evidence that Carlton had furnished Phillips with technical information as early as September and that Phillips, who was at the time otherwise occupied pursuing a business deal directly with CBM, did not attempt to withdraw from the Carlton/Phillips agreement until several months later.

■ In regard to the jury's finding that Phillips failed to comply with the agreement, Carlton, as noted above, presented evidence that it, in satisfaction of the terms of the addendum, furnished Phillips, and had arranged to be further furnished to Phillips, technical and other information for his due diligence. The addendum provided that Phillips would use this information to investigate participation in the Bulgaria Project and, if Phillips was not satisfied, he could withdraw from the Carlton/Phillips agreement. Carlton presented evidence that, contrary to the contractual term allowing Phillips to use this information for reviewing the Carlton/Phillips agreement, Phillips used this information as part of his plan to form a separate entity, supplant Carlton in the Bulgaria Project, and contract directly with CBM, all unbeknownst to Carlton. Simply put, the jury could have reasonably disbelieved Phillips's December 3, 2004 stated reasons for not going "forward" with the Carlton/Phillips agreement. And, it is undisputed that Phillips never paid Carlton the $8.5 million required by the Carlton/Phillips agreement.[10] Viewing the evidence in the light most favorable to the jury's finding, we conclude that the jury could have reasonably found that Phillips failed to comply with the Carlton/Phillips agreement. We further conclude that the evidence supporting the finding is not so weak as to render the jury's finding clearly wrong and manifestly unjust.

■ In regard to their charge complaint, Phillips and EurEnergy assert that the trial court should have instructed the jury that "(1) there is no agreement unless the party to whom an offer or counteroffer is made accepts it before knowing the offer or counteroffer has been withdrawn; and (2) a binding contract is formed when the contract is delivered to the appropriate party, which occurs when the delivering party parts with possession or custody of

---

10. Phillips and EurEnergy emphasize conflicting correspondence from Carlton indicating that Carlton was unsure of whether Phillips intended to participate in the Bulgaria Project pursuant to the Carlton/Phillips agreement as well as Phillips's December 3, 2004 withdrawal letter, to which Carlton did not object until much later. The jury was presented with this evidence, and, to the extent that it is conflicting, the jury was free to resolve those conflicts against Phillips. Additionally, the jury's findings are supported by the evidence that Carlton, pursuant to the Carlton/Phillips agreement, provided Phillips with technical and other information and Phillips breached the Carlton/Phillips agreement by using this information beyond the terms stated in the addendum.

an instrument with the intent that it become operative." Phillips and EurEnergy argue that the jury could not have been fully apprised of the significance of Carlton's failure to produce evidence that an executed copy of the Carlton/Phillips agreement was ever delivered to Phillips. We review a trial court's decision to refuse an instruction in its charge for an abuse of discretion. *Dew v. Crown Derrick Erectors, Inc.,* 208 S.W.3d 448, 456 (Tex.2006). Although Phillips and EurEnergy argue that their proposed instruction would have been "necessary" because the issue was "hotly contested," they have not cited any authority requiring such an instruction. Even if such an instruction were proper, Phillips and EurEnergy disregard the ample evidence that the parties conducted themselves in accordance with the Carlton/Phillips agreement after Phillips executed it and O'Dell, on behalf of Carlton, executed it shortly after Phillips did so in August 2004. Accordingly, we hold that the trial court did not abuse its discretion in not instructing the jury as requested by Phillips and EurEnergy.

Finally, Phillips and EurEnergy challenge the jury's finding that Phillips's failure to comply with the Carlton/Phillips agreement was not excused, asserting that Carlton first failed to comply with a material obligation, Carlton waived compliance, and Carlton fraudulently induced Phillips's non-compliance. Phillips and EurEnergy's material-obligation challenge arises from their contention that Carlton promised Phillips a 10% "working interest" in the Bulgaria Project, despite the fact that "Carlton did not own, and never could own, a working interest" because the Bulgaria/CBM concession provided that Bulgaria retained ownership of minerals. However, as Carlton notes, this term was not defined in the Carlton/Phillips agreement. O'Dell also testified that this term was "not used in a legal sense but in a nondefined generic sense," and he explained that Phillips never raised this objection, even in his December 3, 2004 withdrawal letter. Thus, this evidence contradicts Phillips and EurEnergy's argument that Phillips was fraudulently induced into entering the Carlton/Phillips agreement because he did not understand the term "working interest," as it was used in the governing documents. Similarly, Carlton also presented evidence that it did not commit a material breach by not setting up a joint venture, as required in the Carlton/Phillips agreement, and not closing within 30 days. Phillips did not express any concern about these matters in his December 3, 2004 letter, and Carlton presented evidence that it was waiting on action by Phillips before it could accomplish these tasks. And, of course, the jury heard evidence that during this period, between August and December 2004, Phillips was actively working to set up his own deal directly with CBM. From this evidence, the jury could have reasonably found that Phillips's breach was not excused.

Accordingly, we hold that the evidence is legally and factually sufficient to support the jury's breach-of contract findings and the trial court did not abuse its discretion in not instructing the jury as requested by Phillips and EurEnergy.

We overrule Phillips and EurEnergy's fourth issue.

### Exemplary Damages

In their third issue, Phillips and EurEnergy argue that the evidence is legally and factually insufficient to support the jury's awards of exemplary damages because there is no evidence to support the actual damages award nor any evidence that Phillips and EurEnergy acted "with intent to harm Carlton or that Carlton suffered eco-

nomic harm." Phillips and EurEnergy also assert that the jury's exemplary damages awards are excessive and violate the Due Process Clause of the Fourteenth Amendment.[11] Phillips and EurEnergy further argue that the exemplary damages awards are excessive because the trial court refused to reduce or remit the awards "after remitting more than half the actual damages" and, "even under the most generous view," the evidence supports only actual damages of $4,428,000.[12]

◼ As detailed above, Carlton presented substantial evidence that Phillips and EurEnergy knew that Carlton had an "exclusive" agreement with CBM, had acquired an interest in the Bulgaria Project, and had a contractual right to fund the second tranche under the CBM/Carlton agreement. Phillips had also entered into the Carlton/Phillips agreement to provide Carlton with $8.5 million for it to fulfill its funding obligation under the CBM/Carlton agreement. Carlton also presented substantial evidence that Phillips and EurEnergy acted with malice, i.e., a specific intent to cause substantial injury or harm to Carlton, by seeking to, without Carlton's knowledge, "supplant" Carlton's position in the Bulgaria Project. Although Phillips and EurEnergy presented conflicting evidence that Phillips did not believe that he had an enforceable contact with Carlton as well as evidence that he sought a new deal with CBM for business reasons rather than any specific intent to cause Carlton harm, the jury was free to disbelieve Phillips's testimony and other contradictory evidence. Accordingly, we hold that the exemplary damage awards against Phillips and EurEnergy are supported by clear and convincing evidence. *See Qwest Int'l*

*Commc'ns, Inc. v. AT & T Corp.*, 167 S.W.3d 324, 326 (Tex.2005) ("As clear and convincing evidence was required, we review all the evidence in the light most favorable to the jury's finding, taking into account contrary undisputed facts, to determine whether reasonable jurors could have formed a firm belief or conviction regarding malice."); *see also In re J.F.C.*, 96 S.W.3d 256, 264, 266–67 (Tex.2002).

◼ In regard to the due process challenge, an assessment of grossly excessive exemplary damages violates a party's substantive due process rights because it "furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *Bennett v. Reynolds*, 315 S.W.3d 867, 873 (Tex.2010); *see also* U.S. CONST. amend. XIV, § 1 ("nor shall any State deprive any person of life, liberty, or property, without due process of law"). In reviewing whether the exemplary damages award is unconstitutionally excessive, we consider three guideposts adopted by the United States Supreme Court: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between actual and exemplary damages; and (3) a comparison of the exemplary damages awarded and other civil or criminal penalties that could be imposed for similar misconduct. *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 308 (Tex. 2006).

◼ The first guidepost, the degree of reprehensibility of the defendant's misconduct, is the most important. *Gore*, 517 U.S. at 575, 116 S.Ct. at 1599. In determining the degree of reprehensibility, we

11. *See* U.S. CONST. amend. XIV.

12. The jury was asked to determine, by clear and convincing evidence, whether the harm to Carlton resulted from malice. The trial court instructed the jury that malice "means a specific intent to cause substantial injury or harm" to Carlton.

should consider whether the harm was physical as opposed to economic; whether the conduct constituted an indifference to or a reckless disregard of the health or safety of others; whether the target of the conduct was financially vulnerable; whether the conduct involved repeated actions or was an isolated incident; and whether the harm was the result of intentional malice, trickery, deceit, or mere accident. *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 419, 123 S.Ct. 1513, 1521, 155 L.Ed.2d 585 (2003); *Gore,* 517 U.S. at 576, 116 S.Ct. at 1599. The presence of any one of these factors may still not be enough to support an award of exemplary damages, and the absence of all of these factors renders the award suspect. *Campbell,* 538 U.S. at 419, 123 S.Ct. at 1521 (citing *Gore,* 517 U.S. at 576–77, 116 S.Ct. at 1599).

Here, in regard to the third guidepost, there is nothing in the record regarding other civil or criminal penalties that could have been imposed against either Phillips or EurEnergy for similar misconduct. In regard to reprehensibility, the harm to Carlton was economic, the conduct did not involve an indifference to or a reckless disregard for the health or safety of others, Carlton was not a financially vulnerable plaintiff, and there is no evidence of repeated actions. However, the evidence amply supports the jury's finding that the economic harm to Carlton was the result of intentional malice and deceit. Again, as detailed above, the jury was presented with substantial evidence that would have permitted it to reasonably find, by clear and convincing evidence, that Phillips had engaged in a high level of deceit with his purported business partner, Carlton, in an effort to usurp Carlton's opportunities associated with the Bulgaria Project. *See Pitts & Collard, L.L.P. v. Schechter,* 369 S.W.3d 301, 331–32 (Tex.App.-Houston [1st Dist.] 2011, no pet. h.) (holding that evi-dence was legally and factually sufficient to support award of exemplary damages). This evidence demonstrated that Phillips and CBM even anticipated litigation resulting from their conduct. In fact, CBM's lawyer expressly raised the prospect that the parties were actually tortiously interfering with the CBM/Carlton agreement. And the evidence supports the conclusion that Phillips intentionally engaged in a secret plan to deprive Carlton of its contractual interest in hopes of benefitting himself and other Phillips-related entities.

In regard to the second guidepost, the separate exemplary damages awards of $8.5 million against Phillips and $8.5 million against EurEnergy constitute approximately one-eighth of the $66.5 million of actual damages awarded to Carlton by the jury. *See Huynh v. Phung,* No. 01–04–00267–CV, 2007 WL 495023, at *13 (Tex. App.-Houston [1st Dist.] Feb. 16, 2007, no pet.) (mem. op.) (stating that "[b]ecause exemplary damages are awarded on an individual basis and require separate jury findings as to each defendant, the proper method for reviewing the constitutionality of exemplary damages is to compare the exemplary damages awarded against each individual with the compensatory damages awarded against that individual"). The gist of Phillips and EurEnergy's argument is that "[w]hile the disparity between the actual and punitive damages awards may not be unreasonable on its face, the fact that Carlton actually suffered no harm—given the failure of the project—suggests the award is excessive." However, it does not matter that the project ultimately did not succeed. The fact remains that Carlton had a significant interest in the Bulgaria Project at the time that Phillips and EurEnergy tortiously interfered with the CBM/Carlton agreement, and Carlton's interest had a market value. Thus, comparing the amount of exemplary damages

awarded against Phillips and EurEnergy separately to the amount of actual damages awarded against them jointly and severally, the ratio of actual to exemplary damages, although not controlling, suggests that the damages are not excessive. *See Campbell*, 538 U.S. at 425, 123 S.Ct. at 1524 (indicating that "few awards exceeding a single-digit ratio between punitive and compensatory damages" will satisfy due process).

After considering the pertinent guideposts, we hold that the exemplary damage awards against Phillips and EurEnergy are not constitutionally excessive and do not violate substantive due process rights. *See* U.S. CONST. amend. XIV. Finally, having held that the trial court erred in ordering a remittitur of Carlton's damages, we conclude that Phillips and EurEnergy's complaint that the trial court erred in not reducing or remitting the exemplary damages "after remitting more than half the actual damages" is without merit.

We overrule Phillips and EurEnergy's third issue.

**Alter Ego Finding Against EurEnergy**

In their sixth issue, Phillips and EurEnergy argue that the evidence is legally and factually insufficient to support the jury's finding that EurEnergy is Phillips's alter ego because the "sum total of evidence shows no more than that Phillips is an indirect minority shareholder of EurEnergy" in that he "owns 100% of Syntek West, Inc., which in turn owns Envicon, which in turn owns 20% of EurEnergy." Within this issue, Phillips and EurEnergy assert that the trial court improperly submitted the matter to the jury and, under Nevada law, which they contend applies, the matter should have been decided by the trial court.

First, even if Nevada substantive law applied to this issue, matters of remedy and procedure are nonetheless governed by the law of the forum state. *In re Wells Fargo Bank Minn. N.A.*, 115 S.W.3d 600, 605 n. 7 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding [mand. denied]). "In particular, whether a party is entitled to a jury trial on a particular claim is typically a procedural issue governed by the law of the forum." *Id.* (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 129 (1969)). Accordingly, we hold that the trial court did not err in submitting the issue to the jury.

Second, setting aside the parties' disputes about which substantive law applies, we assess legal sufficiency of the evidence according to the trial court's charge. *Osterberg*, 12 S.W.3d at 55. The trial court asked the jury to determine whether Phillips was "responsible for the conduct of EurEnergy," instructing the jury that Phillips was responsible if EurEnergy "was organized as a mere tool or business conduit" of Phillips and "there was such unity between" EurEnergy and Phillips that "the separateness" of EurEnergy "ceased and holding only [EurEnergy] responsible would result in injustice." The trial court further instructed the jury that it should consider the degree to which EurEnergy's property had been kept separate from Phillips, the amount of financial interest, ownership, and control Phillips maintained over EurEnergy, and whether EurEnergy had been used for the personal purposes of Phillips.

Finally, the alter ego arguments made in the trial court were substantial, as was the evidence presented by Carlton in its effort to obtain an affirmative finding on this question. Yet, Phillips and EurEnergy's appellate challenge to this finding is simply that the "sum total of evidence" did not support the jury's affirmative finding. In this sufficiency challenge, Phillips and

EurEnergy provide one citation to the record, which refers to five pages from one volume of the reporter's record in a record that contains over forty volumes, 2000 pages of live testimony, and hundreds of exhibits. Accordingly, we conclude that Phillips and EurEnergy have waived this challenge for our review. *See* TEX.R.APP. P. 38.1(h).

We overrule Phillips and EurEnergy's sixth issue.

### Admission of Evidence Regarding Phillips–Related Entities

In their seventh issue, Phillips and EurEnergy argue that because the trial court erred in admitting "voluminous," "irrelevant," and "harmful and prejudicial" evidence about Phillips-related companies, we must remand this case for a new trial. Phillips and EurEnergy note that the trial court granted directed verdicts or a judgment notwithstanding the verdict in favor of seven Phillips-related entities. They assert that, after the admission of the evidence, "it was too late to remove the taint caused by the jury's exposure to the irrelevant evidence" pertaining to these seven companies.

However, Phillips and EurEnergy never sought a limiting instruction regarding the evidence. Having failed to do that, Phillips and EurEnergy cannot complain on appeal about any harm allegedly caused by the introduction of evidence related to these seven entities. *See* TEX.R. EVID. 105(a). Additionally, we have reviewed the entire record, and although we cannot say that the evidence pertaining to these Phillips-related entities was trivial, we also cannot say that it was a substantial part of Carlton's case. When compared to the remaining portions of this substantial record, we cannot say that this evidence influenced the jury to the extent that it probably caused the rendition of an improper judgment. *See* TEX.R.APP. P. 44.1(a).

We overrule Phillips and EurEnergy's seventh issue.

### Alter Ego Findings Against Syntek and CabelTel

In its second issue, Carlton argues that the trial court erred in setting aside the jury's alter ego findings against Syntek and CabelTel because legally-sufficient evidence established that Syntek and Cabel-Tel were alter egos of EurEnergy.

Consistent with our holding above, we conclude that the trial court did not err in submitting this matter to the jury. *See In re Wells Fargo Bank Minn. N.A.*, 115 S.W.3d at 605 n. 7. Moreover, neither party objected to the pertinent jury question, which required the jury to make findings of alter ego in accord with Nevada law. We, therefore, evaluate the legal sufficiency of the evidence according to the trial court's charge. *Osterberg*, 12 S.W.3d at 55.

In accord with Nevada law, and without objection, the trial court instructed the jury that CabelTel and Syntek could be found to be the alter egos of EurEnergy if EurEnergy was "influenced and governed by" CabelTel and Syntek, there was "such unity of interest and ownership that" EurEnergy was "inseparable" from and CabelTel and Syntek, and "[a]dherence to the corporate fiction" of CabelTel and Syntek "would sanction fraud or promote a manifest injustice." The jury found that both CabelTel and Syntek were the alter egos of EurEnergy, but the trial court granted a judgment notwithstanding the verdict on these findings. Accordingly, in its final judgment, the trial court did not grant Carlton any relief against CabelTel and Syntek.

### CabelTel

█ In support of its argument that EurEnergy was governed and influenced by CabelTel, Carlton cites the testimony of Dave Morgan, a consultant for CabelTel, who was appointed as EurEnergy's managing director. Morgan testified that he was employed by CabelTel when he, Phillips, and other Phillips representatives met with Carlton representatives to discuss the Bulgaria Project. Morgan explained that he was told that "we're going to do this deal through EurEnergy" and he was "going to be a part of that company." He "was asked to sit in on" the deal "because [he] was the only one . . . that understood oil and gas" in the Phillips group. Morgan's "consulting fees" were paid by CabelTel, or a Phillips-associated payroll company, and he stated that he never received a paycheck from EurEnergy. He believed that there was "no distinction" to be made when he was preparing memos and using CabelTel or EurEnergy letterhead. When asked about the identity of a president of EurEnergy, Morgan, who was its managing director, stated that he did not know "the corporate organization" of EurEnergy. And, during the fall of 2004, he worked in the CabelTel offices. Morgan noted that EurEnergy had four or five employees, and it used the address next door to CabelTel for its offices. Morgan also noted that EurEnergy retained its files at CabelTel pursuant to a contract with EurEnergy and CabelTel "does the management of all the records and payment of all the bills" for EurEnergy. Morgan explained that Gene Bertcher at CabelTel, who was located "across the hall," wrote the checks for EurEnergy.

In support of its argument that CabelTel and EurEnergy were inseparable and there was a unity of interest and ownership between the two, Carlton again notes the evidence indicating that both companies shared an address and Morgan, EurEnergy's managing director, was paid as a CabelTel employee. Carlton also emphasizes Phillips's testimony, which indicates that he did not observe corporate formalities in the companies in which he was involved.

Finally, in support of its argument that adherence to the corporate fiction of CabelTel and EurEnergy as separate entities would sanction fraud or promote manifest injustice, Carlton cites the evidence that, when preparing to supplant it in the CBM/Carlton agreement, Phillips elected to use a dormant real estate investment company and changed its name to EurEnergy. Carlton notes that the initial president of EurEnergy admitted that he had no knowledge about EurEnergy's business activities or financial positions. Additionally, EurEnergy was formed without any offices, was capitalized for only $1,000, and needed "help from someone else" to engage in the multi-million dollar transaction with CBM. Moreover, EurEnergy provided CBM with indemnity obligations in regard to the potential dispute with Carlton, and the jury was presented with evidence that EurEnergy was not adequately capitalized to meet those obligations.

Viewing the evidence in the light most favorable to the jury's finding, we conclude that that the jury could have reasonably found that CabelTel was an alter ego of EurEnergy. Accordingly, we hold that the evidence is legally sufficient to support the jury's alter ego findings against CabelTel and the trial court erred in granting a judgment notwithstanding the verdict in favor of CabelTel.

### Syntek

█ In support of its argument that EurEnergy was governed and influenced by Syntek, Carlton notes that the evidence reveals that Phillips owned 100% of Syntek and served as its president, chief executive

officer, and chairman of the board. As the sole owner, Phillips agreed that he had the power to control the officers and directors of Syntek. When Phillips met with Thomas O'Dell of Carlton Energy regarding the Bulgaria Project, Phillips provided him with a Syntek business card. Documents pertaining to the deal between the Phillips Group and CBM were signed and approved by Ken Joines, the general manager of Syntek, but Joines actually signed it on behalf of EurEnergy, not Syntek. Joines also provided a Syntek e-mail address in correspondence regarding the CBM/EurEnergy JDA. When litigation ensued between EurEnergy and CBM, Phillips was appointed by Syntek to represent EurEnergy at mediation. Carlton also presented evidence that Phillips, the sole owner, president, chief executive officer, and chairman of the board of Syntek, was the primary decision maker in EurEnergy.

In support of its argument that Syntek and EurEnergy became inseparable and there was a unity of interest and ownership between the two, Carlton cites evidence that Syntek and EurEnergy shared offices and Syntek's general manager, Neil Crouch, was also the sole officer and director of EurEnergy. Additionally, Carlton presented evidence that Syntek employees referred to Syntek and EurEnergy interchangeably. For example, Joines approved the CBM/EurEnergy JDA on behalf of EurEnergy. But, in doing so, Joines used a Syntek e-mail address. The CBM/EurEnergy JDA also provided that, if a notice was to be sent to EurEnergy, it should be sent to Syntek, rather than EurEnergy. Additionally, the contract that EurEnergy entered into for drilling the first well in Bulgaria pursuant to the CBM/EurEnergy JDA identified the operator of the well as Syntek, not EurEnergy. Morgan claimed that this was an error, but he agreed that this

"error" had never been corrected. John Hughett, EurEnergy's operations manager in Bulgaria, signed a Master Service Agreement as operations manager on behalf of Syntek, not EurEnergy, and he stated that he was authorized to do so by Joines. In an e-mail to a Bulgarian company associated with the CBM/EurEnergy JDA, Hughett stated that "EurEnergy/Syntek[ ]" would assume any costs and rental rates incurred as a result of actions taken by Bulgarian Customs.

Finally, in support of its argument that adherence to the corporate fiction of Syntek and EurEnergy as separate entities would sanction fraud or promote manifest injustice, Carlton again emphasizes that EurEnergy was formed with no separate offices or employees, nominal capital, and a nominal president. Moreover, Carlton notes that Syntek's general manager signed the CBM/EurEnergy JDA on behalf of EurEnergy; EurEnergy's president, secretary/treasurer, and sole director is the general manager of Syntek; Syntek's sole owner, president, and CEO is the ultimate decision-maker at EurEnergy; and the name of Syntek and EurEnergy have been used interchangeably in contracts and communications with multiple parties.

Viewing the evidence in the light most favorable to the jury's findings, we hold that the jury could have reasonably found that Syntek was an alter ego of EurEnergy. Accordingly, we hold that the evidence is legally sufficient to support the jury's alter ego findings against Syntek and the trial court erred in granting a judgment notwithstanding the verdict in favor of Syntek.

We sustain Carlton's second issue.

### Joint and Several Liability for Exemplary Damages

 In its third issue, Carlton argues that the trial court erred in not rendering

judgment that Phillips is jointly and severally liable for the exemplary damages awarded against EurEnergy because the jury found Phillips responsible for the conduct of EurEnergy.

"In any action in which there are two or more defendants, an award of exemplary damages must be specific as to a defendant, and each defendant is liable only for that amount of the award made against that defendant." TEX. CIV. PRAC. & REM. CODE ANN. § 41.006 (Vernon Supp. 2010). Although Carlton argues that this section does not "categorically ban joint and several liability for exemplary damages," it cites to no authority suggesting that an alter ego finding can trump the plain language of section 41.006. However, even if such a finding might in some circumstances permit joint and several liability for exemplary damages, section 41.003 provides that "[e]xemplary damages may be awarded only if the jury was unanimous in regard to finding liability for and the amount of exemplary damages." *Id.* § 41.003(d); *see also* TEX.R. CIV. P. 292(b) ("A verdict may be rendered awarding exemplary damages only if the jury was unanimous in finding liability for and the amount of exemplary damages."). Here, under the structure of the charge, the jury was permitted to make a non-unanimous alter-ego finding. Accordingly, we hold that the trial court did not err in not rendering a judgment making Phillips jointly and severally liable for the exemplary damages awarded against EurEnergy.

We overrule Carlton's third issue.[13]

## Conclusion

We reverse the portion of the trial court's judgment ordering that Carlton recover only $31,160,000 in actual damages from Phillips and EurEnergy, jointly and severally, and we render judgment that Carlton recover $66,500,000 in actual damages from Phillips and EurEnergy, jointly and severally. We reverse the trial court's take-nothing judgment entered in favor of Syntek and CabelTel, and we render judgment that Syntek and CabelTel are jointly and severally liable for the $66,500,000 in actual damages awarded to Carlton from EurEnergy. We affirm the remaining portions of the trial court's judgment.

---

**13.** We note that Carlton, in the prayer of its brief, also asks that we render a judgment providing that CabelTel and Syntek are jointly and severally liable for the exemplary damages imposed against EurEnergy. For the same reasons we articulate above, we decline Carlton's request to impose against CabelTel and Syntek joint and several liability for the exemplary damages awarded against EurEnergy.