**Opinion issued August 30, 2016**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-09-00997-CV

———————————

**CARLTON ENERGY GROUP, LLC, Appellant/Cross-Appellee**

**V.**

**GENE E. PHILLIPS, INDIVIDUALLY AND D/B/A PHILLIPS OIL INTERESTS L.L.C., EURENERGY RESOURCES CORPORATION, SYNTEK WEST, INC. AND CABELTEL INTERNATIONAL CORPORATION, Appellees/Cross-Appellants**

On Appeal from the 295th District Court
Harris County, Texas
Trial Court Case No. 2006-80212

**OPINION ON REMAND**

Appellant/cross-appellee, Carlton Energy Group, LLC ("Carlton"), challenged the trial court's judgment, entered after Carlton accepted the trial court's suggested remittitur of the jury's actual damages award in lieu of a new trial,[1] in Carlton's suit against appellees/cross-appellants, Gene E. Phillips, individually and doing business as Phillips Oil Interests L.L.C. ("Phillips"), EurEnergy Resources Corporation, formerly known as EurEnergy Resources LLC ("EurEnergy"), Sytnek West, Inc. ("Syntek"), and CabelTel International Corporation ("CabelTel") (collectively, the "Phillips entities"), for tortious interference and breach of contract. In three issues, Carlton contended that the trial court erred in "suggesting a remittitur to $31.16 million in actual damages when factually-sufficient evidence supported the jury's finding of actual damages of $66.5 million or, alternatively, at least $38 million"; setting aside the jury's alter ego findings against Syntek and CabelTel; and not imposing joint and several liability on Phillips for the exemplary damages awarded against EurEnergy "when the jury found Phillips responsible for EurEnergy's conduct."

In their cross-appeal, Phillips and EurEnergy, in their first six issues, contended that the evidence is legally and factually insufficient to support the trial

---

[1]    Carlton accepted the trial court's suggested remittitur subject to its right to appeal. *See* TEX. R. APP. P. 46.2 (providing party who remits judgment at trial court's suggestion may complain about remittitur on appeal if party benefiting from remittitur appeals and remitting party independently perfects appeal).

2

court's award of $31.16 million in actual damages; the jury's finding that Phillips and EurEnergy tortiously interfered with Carlton's contract with CBM Energy Limited ("CBM"); the jury's awards of exemplary damages against Phillips and EurEnergy; the jury's finding that Phillips breached his contract with Carlton; the jury's awards of attorney's fees to Carlton; and the jury's finding that EurEnergy is Phillips's alter ego. In their seventh issue, Phillips and EurEnergy contended that the trial court's "erroneous admission of voluminous, irrelevant evidence about Phillips-related companies was harmful and prejudicial" and required a new trial.

We held that the evidence is legally and factually sufficient to support the jury's liability findings and award of actual damages. *Carlton Energy Grp., LLC v. Phillips*, 369 S.W.3d 433, 456 (Tex. App.—Houston [1st Dist.] 2012), *aff'd in part*, *rev'd in part*, 475 S.W.3d 265 (Tex. 2015). Accordingly, we reversed the portion of the trial court's judgment ordering that Carlton recover only $31.16 million in actual damages from Phillips and EurEnergy, jointly and severally, and we rendered judgment that Carlton recover $66.5 million in actual damages from Phillips and EurEnergy, jointly and severally. *Id.* at 465. We further reversed the trial court's take-nothing judgment entered in favor of Syntek and CabelTel, and we rendered judgment that Syntek and CabelTel were jointly and severally liable for the $66.5 million in actual damages awarded to Carlton from EurEnergy. *Id.* We affirmed the remaining portions of the trial court's judgment. *Id.*

3

The Texas Supreme Court reversed our judgment, in part, and remanded the case, stating:

> The trial court suggested a remittitur from the $66.5 million damages found by the jury to the $31.16 million based on [Carlton's damages expert's] third model. Carlton accepted the remittitur in lieu of a new trial, reserving the right to complain that judgment should have been rendered on the verdict. Phillips has argued that the evidence is factually insufficient to support the judgment. The court of appeals did not address these issues, and they may be raised on remand.

*Phillips v. Carlton Energy Grp., LLC*, 475 S.W.3d 265, 282–83, 286 (Tex. 2015).

On remand, we affirm the portion of the trial court's judgment awarding Carlton $31.16 million in actual damages.

## Background

On October 4, 2000, CBM entered into an agreement with the government of the country of Bulgaria (the "Bulgaria/CBM concession") permitting CBM to conduct exploration and prospecting for natural gas on a large parcel of land located within that country (the "Bulgaria Project"). The Bulgaria/CBM concession provided CBM with an initial term of three years to conduct the prescribed exploration and the possibility of two extension periods of no more than two years each. The Bulgaria/CBM concession also defined CBM's "minimum work obligations," which included the drilling of one exploratory well, which, if successful, would require the drilling of two additional wells.

4

On April 25, 2003, CBM, in need of financing to satisfy its obligations under the Bulgaria/CBM concession, entered into a letter agreement with Carlton (the "CBM/Carlton agreement") under which Carlton, in exchange for making, pursuant to a schedule, three tranches[2] of funding totaling $8 million, would acquire, incrementally, a 48% interest in the Bulgaria Project. Upon "actual[] fund[ing]" of the first tranche of $1.25 million, which was to be applied to cover the costs for drilling the first well, as well as other incidental costs, Carlton would acquire a 7.5% interest in the Bulgaria Project. Additionally, upon the actual funding of the first tranche, the "arrangement" between CBM and Carlton would become "exclusive." Carlton would then have three months to "actually fund" the second tranche of $1.5 million, which was to be applied to cover the costs of two additional wells. Carlton would then have one year after the date of the second tranche to "actually fund" the remainder of its $8 million financing commitment.

In 2004, Bulgaria, by way of an annex to the Bulgaria/CBM concession, granted CBM a two-year extension of the Bulgaria Project. In turn, on April 13, 2004, CBM and Carlton amended the CBM/Carlton agreement so that upon Carlton's "actual fund[ing]" of a first tranche of $900,000, Carlton would be entitled to a 5.4% interest in the Bulgaria Project and, as with the original agreement, the

---

[2]     Tranche is defined as "a portion of something, esp. money: *they released the first tranche of the loan.*" David Bach, 1001 FINANCIAL WORDS YOU NEED TO KNOW 202 (Oxford University Press 2003).

"arrangement" between CBM and Carlton would become "exclusive." Carlton would then have three months to "actually fund" the second tranche of $1.85 million and one year after the date of the second tranche to "actually fund" the remainder of its $8-million financing commitment. The CBM/Carlton agreement, as amended, further provided that it would not become effective until "actual funding" of the first tranche and "actual funding" would occur if Carlton funded $300,000 in cash and a $600,000 letter of credit. Carlton presented evidence that CBM subsequently agreed to an oral modification of the terms regarding the second tranche, and the jury specifically found that CBM had "agree[d] that the timing of the second tranche of funding ($1,850,000) would take place within 90 days of the funding of the initial tranche or 30 days after receipt of logs for the initial well, whichever date was later." Phillips and EurEnergy disputed that such an oral amendment was ever made, or could have been made, and they asserted that Carlton was not entitled to an additional 30-day period to review the logs from the initial well before making the second tranche.

On April 27, 2004, Carlton, with funds provided by investor Robert Assil, furnished the $600,000 letter of credit, and it is undisputed that this letter of credit was sufficient to extend the Bulgaria/CBM concession to 2005. Subsequently, on July 20, 2004, Carlton, with funds provided by investor Kenneth Scholz, transferred the remaining $300,000 in its attempt to satisfy the first tranche of funding

prescribed in the amended CBM/Carlton agreement. At trial, Carlton asserted that it had satisfied its first tranche obligation and, thus, it earned its "vested" 5.4% interest in the Bulgaria Project and obtained its right to fund the second tranche. Phillips and EurEnergy disputed this and emphasized that on July 27, 2004, after receiving the $300,000 wire transfer, CBM sent Carlton a letter in which it noted that it would not agree to certain restrictions Scholz placed on the $300,000 payment. In the letter, CBM noted that Carlton's funding obligations were "absolute," the parties had not contemplated "partial funding," the wire transfer did "not constitute performance," and CBM would not agree to an extension for Carlton to make the second tranche. Carlton presented evidence that, despite this letter, it and CBM subsequently conducted themselves as if Carlton had satisfied the first tranche of funding.

Believing that it had satisfied the first tranche of funding, Carlton, in the course of seeking additional resources to fund its remaining obligations, came into contact with Phillips. In the summer of 2004, Carlton, in a proposed letter agreement, offered Phillips the right to acquire a "10% working interest" in the Bulgaria Project in exchange for $8.5 million. Carlton was to use the cash infusion to fulfill its funding obligations under the CBM/Carlton agreement, and its 48% interest in the Bulgaria Project would be reduced to 38% with Phillips's acquisition from Carlton of the 10% interest. On August 23, 2004, Phillips signed the letter

7

agreement (the "Carlton/Phillips agreement") with an addendum that provided that Phillips would "have a 30 day period to review all documentation and technical information in connection with [the Bulgaria Project]" and "[i]f for any reason" he was "not satisfied with [his] investigation then [he would] withdraw from this agreement."

Carlton, at trial, contended that its chairman and managing director, T.C. O'Dell, signed and accepted Phillips's counteroffer and, thus, it formed a contractual relationship with Phillips. O'Dell testified that he signed the Carlton/Phillips agreement with Phillips's addendum "shortly" after receiving it from Phillips, and Carlton introduced a fully executed copy of it into evidence. O'Dell explained that Carlton, pursuant to ordinary procedures, would have sent a fully executed copy of the Carlton/Phillips agreement to Phillips, but he conceded that Carlton did not possess a record of having sent a copy to Phillips.

The undisputed evidence presented at trial demonstrates that Phillips, in September 2004, shortly after he signed the Carlton/Phillips agreement, met with Carlton representatives, including O'Dell, regarding the Bulgaria Project. Nevertheless, Phillips testified that he never received notice that Carlton had accepted the terms of what he described as his "counteroffer" and, thus, he had never formed a contractual relationship with Carlton.

Phillips did not provide to Carlton any funding pursuant to the Carlton/Phillips agreement. And Carlton presented evidence that during the fall of 2004, when it was providing Phillips with technical information about the Bulgaria Project, Phillips and his representatives, without Carlton's knowledge, were in direct contact with CBM about the Bulgaria Project. Carlton contended that this evidence demonstrates that Phillips, beginning in the early fall of 2004, was taking steps to supplant Carlton in the Bulgaria Project "by secretly dealing with CBM." Phillips countered with evidence that he withdrew from the Carlton/Phillips agreement for business reasons. According to Phillips, he "quickly became disenchanted with Carlton" and O'Dell during his "due diligence efforts" and, by mid-November 2004, he had already informed a Carlton broker that he had no interest in working with Carlton. On December 3, 2004, Phillips sent Carlton a letter in which he stated that because of "tight time constraints," he was "unable to make a determination to participate in this venture," and he declined "to go forward with any proposed transaction."

On February 10, 2005, EurEnergy, a company which was later revealed to be connected to Phillips, sent CBM a letter outlining the details of a joint development agreement between EurEnergy and CBM regarding the Bulgaria Project. CBM agreed, upon EurEnergy's funding, to declare Carlton in default of the CBM/Carlton agreement and return Carlton's investment. EurEnergy agreed to "replace" the $600,000 letter of credit that had been posted by Carlton and indemnify CBM in any

9

future legal proceedings brought against it by Carlton. EurEnergy and CBM, on February 11, 2005, executed a joint development agreement (the "CBM/EurEnergy JDA"), in which CBM acknowledged that it needed financing for the Bulgaria Project and EurEnergy agreed to fund at least $6.5 million in exchange for a conditional 60% interest in the Bulgaria Project.

CBM, on February 25, 2005, in satisfaction of its agreement with EurEnergy, sent Carlton a notice stating that Carlton's "material breach of the critical funding terms," including Carlton's failure to make the second tranche, forced it to seek reliable financing for the Bulgaria Project. CBM offered to remit to Carlton the $900,000 it had funded, but only if Carlton would acknowledge that it had no further interest in the Bulgaria Project.

CBM and EurEnergy's relationship subsequently soured, and litigation between CBM and EurEnergy ensued. In May 2006, Phillips, on behalf of EurEnergy, signed a settlement agreement of its suit against CBM, and EurEnergy reaffirmed its obligations and liabilities to CBM "concerning the Carlton matter." Subsequently, Bulgaria terminated the Bulgaria/CBM concession.

In December 2006, Carlton sued Phillips and EurEnergy, along with several other Phillips-related entities, including CabelTel and Syntek, which Carlton alleged were involved in tortious conduct and breach of contract. Specifically, Carlton alleged that Phillips had breached the Carlton/Phillips agreement, Phillips and

EurEnergy had tortiously interfered with the CBM/Carlton agreement, and CabelTel and Syntek were alter egos of EurEnergy.

After a lengthy trial, the jury, in regard to Carlton's breach-of-contract claim, found that Carlton and Phillips entered into the Carlton/Phillips agreement; Carlton agreed to the terms, including those set forth in Phillips's addendum, before receiving a December 3, 2004 letter from Phillips in which he declined participation with Carlton in the Bulgaria Project; Phillips did not send his December 3, 2004 letter in compliance with the terms of the addendum, i.e., the provision providing Phillips 30 days to review documentation and technical information; Phillips failed to comply with the Carlton/Phillips agreement; and Phillips's failure to comply was not excused. In regard to damages, the trial court instructed the jury to award damages for "[t]he fair market value" of Carlton's "interest in the project, if any, at the time of the failure to comply," and the jury found that Phillips's failure to comply caused Carlton $66.5 million in actual damages.

In regard to Carlton's tortious-interference claim, the jury found that Carlton had complied with the provision in the CBM/Carlton agreement requiring Carlton to "actually fund[]" the initial $900,000; CBM and Carlton had agreed that the timing of the second payment of $1.85 million "would take place within 90 days of the funding of the initial tranche or 30 days after receipt of logs for the initial well, whichever date was later"; CBM failed to comply with the CBM/Carlton agreement;

11

Phillips and EurEnergy intentionally interfered with the CBM/Carlton agreement; neither Phillips nor EurEnergy had a "good faith belief" that it had the right to interfere with the CBM/Carlton agreement; and, by clear and convincing evidence, the harm caused by Phillips and EurEnergy to Carlton resulted from malice. The jury found that Phillips and EurEnergy's interference caused Carlton $66.5 million in actual damages; Phillips was "responsible for the conduct of . . . EurEnergy"; and CabelTel and Syntek were the alter egos of EurEnergy.

The trial court then conducted the exemplary-damages phase of trial, after which the jury assessed $8.5 million in exemplary damages against Phillips and $8.5 million in exemplary damages against EurEnergy. The parties then tried the issue of attorney's fees to the court, and the trial court found that Carlton was entitled to $9,954,000 in attorney's fees for trial, $750,000 in attorney's fees in the event of an appeal to the court of appeals, and $250,000 for attorney's fees in the event of an appeal to the Texas Supreme Court.

Carlton moved for judgment on the jury verdict, and Phillips, EurEnergy, CabelTel, and Syntek moved for a judgment notwithstanding the verdict. The trial court granted a judgment notwithstanding the verdict in favor of Syntek and CabelTel, concluding that there was no evidence to support the jury's alter ego findings. The trial court, sua sponte, determined that the jury's actual damages award of $66.5 million for breach of contract and tortious interference was not

supported by factually-sufficient evidence and suggested a remittitur to $31.16 million. Carlton accepted the remittitur, but reserved its right to appeal.[3]

In its final judgment, the trial court awarded Carlton $31.16 million in actual damages on its tortious-interference claim against Phillips and EurEnergy, jointly and severally, and assessed exemplary damages against Phillips and EurEnergy in the amount of $8.5 million each, severally.

Carlton, Phillips, and EurEnergy appealed the trial court's judgment to this Court. In its second issue, Carlton contended that the trial court erred in setting aside the jury's findings that CabelTel and Syntek were alter egos of EurEnergy. *Phillips*, 369 S.W.3d at 462. We held that the evidence is legally sufficient to support the jury's alter ego findings against CabelTel and Syntek and the trial court erred in granting a judgment notwithstanding the verdict in their favor. *Id.* at 463–64.

In their cross-appeal, Phillips and EurEnergy contended that the evidence is legally and factually insufficient to support the jury's finding that they had tortiously interfered with the CBM/Carlton agreement; Phillips had breached the Carlton/Phillips agreement; and EurEnergy is Phillips's alter ego. *Id.* at 437–38. We held that the evidence is legally and factually sufficient to support the jury's

---

[3]     *See* TEX. R. APP. P. 46.2.

findings on Carlton's tortious-interference and breach-of-contract claims.[4]  *Id.* at 446, 458.  And we concluded that the jury could have reasonably inferred that not only did Phillips intentionally breach the Carlton/Phillips agreement, but also that Phillips and CBM willfully planned to remove Carlton from any involvement in the Bulgaria Project and for Phillips, or a Phillips-related entity, to supplant Carlton.[5]  *Id.* at 458, 460.

In its regard to damages, Carlton argued on appeal that the trial court erred in "suggesting a remittitur to $31.16 million in actual damages" because "factually sufficient evidence supports the jury's finding of actual damages of $66.5 million or, alternatively, at least $38 million."  *Id.* at 447.  Carlton asserted that the evidence presented supports "three possible damages awards": (1) a review of all the evidence supports the jury award of $66.5 million, (2) "a calculation by Carlton's damages expert, Pete Huddleston, using a conventional cash-flow model, or 'max/min'

---

[4]  Because the evidence is sufficient to support the jury's findings on Carlton's tortious-interference claim, we did not reach Phillips and EurEnergy's complaint that the evidence is insufficient to support the trial court's finding that Carlton would have been entitled to attorney's fees on its breach-of-contract claim. *Carlton Energy Grp., LLC v. Phillips*, 369 S.W.3d 433, 447 n.4 (Tex. App.—Houston [1st Dist.] 2012), *aff'd in part*, *rev'd in part*, 475 S.W.3d 265 (Tex. 2015).  Although the trial court made such a finding, it did not award Carlton its attorney's fees because it entered judgment on Carlton's tortious-interference claim and awarded Carlton actual and exemplary damages on that claim. *Id.*

[5]  We also held that Phillips and EurEnergy waived their challenge to the sufficiency of the evidence supporting the jury's finding that EurEnergy is Phillips's alter ego.  And we overruled Phillips and EurEnergy's evidentiary challenges. *Id.* at 462.

analysis, supports a damages award of $38 million," and (3) "an alternative calculation by Huddleston using a 'comparable sale' approach support[ed] the award of $31.16 million."[6] *Id.* Phillips and EurEnergy argued that the evidence is legally and factually insufficient to support the trial court's award of $31.16 million in actual damages because determining the fair market value of Carlton's interest in the Bulgaria Project involved "a specialized field outside [the] jurors' knowledge" and the testimony of Carlton's expert, who utilized unreliable foundational data, amounted to "conjecture and speculation." *Id.* at 446–47. Within their legal-sufficiency challenge, Phillips and EurEnergy attacked the valuation models used by Carlton's expert.[7] *Id.* at 447.

We concluded that the jury could have reasonably found that the fair market value of Carlton's interest in the Bulgaria Project at the time that Phillips and EurEnergy tortiously interfered with the CBM/Carlton agreement was at least $66.5 million. *Id.* at 456. The award is amply supported by Huddleston's testimony, the

---

[6] Carlton further argued that the trial court erred in not imposing joint and several liability on Phillips and EurEnergy for the exemplary damages awarded because the jury found Phillips responsible for EurEnergy's conduct. *Id.* at 465.

[7] Alternatively, Phillips and EurEnergy argued that the evidence was factually insufficient to support an award of damages any "greater than the 5.4% of the [Bulgaria Project's] market value" because Carlton was only able to conditionally fund $899,990 and "there is no evidence that Carlton would have obtained" the required $8 million in "funding from any other source. *Id.* at 447. Phillips and EurEnergy further challenged the legal and factual sufficiency of the evidence supporting the trial court's award of punitive damages. *Id.* at 458–61.

detailed information contained in the reports of Dr. Henry Crichlow, a registered professional engineer, and the other substantial testimonial and documentary evidence introduced at trial. *Id.* at 455–56. And we held that the trial court erred in requiring a remittitur of Carlton's actual damages from $66.5 million to $31.16 million. *Id*. at 456.

Phillips, EurEnergy, CabelTel, and Syntek filed a petition for review with the Texas Supreme Court. The supreme court affirmed, in part, and reversed, in part, our judgment and remanded the case back to this court for "further proceedings consistent with [its] opinion." *Phillips*, 475 S.W.3d at 286. In its opinion, the court concluded that "Phillips unquestionably induced CBM to terminate its agreement with Carlton"; the evidence "supports the jury's findings related to tortious interference"; and "Phillips's arguments that he is not liable for tortious interference fail." *Id.* at 278. The court also "conclude[d] that the evidence not only supports the jury's verdict but establishes CabelTel's and [Syntek's] alter ego liability as a matter of law." *Id.* at 286.

The supreme court further concluded that the requirement that damages must be proven to a "reasonable certainty" "does not preclude all recovery in this case, but neither does it permit recovery of all the damages found by the jury." *Id.* at 269. Rather, the "key question," as Phillips argued, is whether the evidence of the fair market value of Carlton's lost interest is too speculative to support the damages

awarded. *Id.* The supreme court considered Carlton's evidence of "three models" for determining the fair market value of its 38% interest in the concession.

First, Huddleston testified that the value of Carlton's interest could be derived from the value of the "gas in the ground," as forecast by Crichlow. *Id.* at 273–74. The supreme court concluded that Huddleston's testimony was "completely conjectural" and "provide[d] no basis for determining the reliability of Crichlow's volume predictions" or "assessing the risks," and no evidence supports the jury's $66.5 million finding. *Id.* at 281. Second, Huddleston estimated the value of Carlton's interest to be from $12.54 to $38 million if wells were drilled only in the vicinity of the Vranino #1. The supreme court concluded that his estimate "rest[ed] on much of the same conjecture as the gas-in-the-ground model" and was "no less speculative." *Id.*

Third, Huddleston determined the value of Carlton's 38% interest in the prospect based on Phillips's agreement to pay Carlton $8.5 million for a 10% interest. *Id.* at 274. He calculated that the entire prospect was worth $85 million, less $3 million in costs to drill the three required wells, and thus the value of a 38% interest was $31.16 million. The supreme court explained:

> This calculation is based on an actual offer by a willing buyer—Phillips—to a willing seller—Carlton. While Huddleston's other models were based on unverifiable assumptions regarding what the concession would actually produce, in this third model those assumptions were subsumed in the assessment of the data by real investors in a market in which such interests are sold. Huddleston

17

testified that there is widespread interest in investment in oil and gas development projects, based on available data, much like that available for the Bulgarian prospect. Phillips argues that there was no real market for the Bulgarian prospect, that CBM and Carlton had made every effort to locate potential investors in the prospect, that all had declined, and that in the end, there was at best a market of one: himself. But there were at least three other investors. [Carlton, Assil, and Scholz]. . . . Phillips argues that the amounts the only other investors were willing to pay shows that the value of Carlton's interest was much less than what even he was willing to pay. Phillips is entitled to argue that the jury's verdict was against the great weight and preponderance of the evidence, an issue we must leave to the court of appeals. But we cannot hold that the amount Phillips was willing to pay Carlton, for the very interest at issue, is not some evidence to support the verdict.

*Id.* at 282. And it concluded:

The trial court suggested a remittitur from the $66.5 million damages found by the jury to the $31.16 million based on Huddleston's third model. Carlton accepted the remittitur in lieu of a new trial, reserving the right to complain that judgment should have been rendered on the verdict. Phillips has argued that the evidence is factually insufficient to support the judgment. The court of appeals did not address these issues, and they may be raised on remand.

*Id.* at 282–83.

We construe the supreme court's holding to be that although the evidence is legally insufficient to support the jury's award to Carlton of $66.5 million in actual damages based on either Huddleston's first or second damages model, it is legally sufficient to support the trial court's award to Carlton of $31.16 million in actual damages based on Huddleston's third damages model. Thus, the supreme court remanded the case to this Court to determine whether the evidence is factually

18

sufficient to support the trial court's award to Carlton of $31.16 million in actual damages based on Huddleston's third damages model.

## The Supreme Court's Remand

In their post-submission brief on remand, Phillips and the Phillips entities assert:

> At oral argument, the parties disagreed sharply about whether the Supreme Court instructed this Court to conduct a factual sufficiency review of the jury's $66.5 million actual damages verdict or of the trial court's $31.16 million remitted actual damages award that was vacated by this Court on the initial appeal. But regardless of which approach this Court takes, Phillips submits that the disposition should be the same: Remand to the trial court.

Phillips and the Phillips entities argue that "[i]f this [C]ourt were to undertake a review of the legally sufficient evidence, it could not presume that the trial court's remitted judgment was correct" because the supreme court "did not direct" this Court to "defer to the trial court's number [$31.16 million]." Rather, the supreme court directed that "Phillips is entitled to argue that the jury's *verdict*" is not supported by factually insufficient evidence. (Emphasis added.) They also assert that this Court, by reversing the trial court's judgment on damages, "made that portion of the trial court's judgment a nullity" and "reinstate[d] the jury's [$66.5 million] verdict." Thus, this Court "should accord no presumption to the [$31.16 million] result once suggested by the trial court." "Rather, it should review the record as a whole to

determine whether there is factually sufficient evidence to support some part of the [$66.5 million] 'verdict.'"

Because the supreme court held that the jury's $66.5 million verdict is not supported by legally-sufficient evidence, we need not consider whether it is supported by factually-sufficient evidence. *See Heckman v. Williamson Cty.*, 369 S.W.3d 137, 162 (Tex. 2012) (appellate courts may not decide moot points). The supreme court held that legally-sufficient evidence supports the trial court's judgment awarding Carlton damages of $31.16 million. And it remanded the case to this Court as follows: "Phillips has argued that the evidence is factually sufficient to support the *judgment*. The court of appeals did not address these issues, and they may be raised on remand." (Emphasis added.) Thus, as Carlton asserts, the "only question presented is whether factually sufficient evidence supports the trial court's $31.16 million judgment."

Further, the trial court's judgment after remittitur is not a "nullity." Although the jury initially awarded Carlton $66.5 million in actual damages, the trial court, after Carlton accepted its suggested remittitur, modified the jury award and rendered a judgment awarding Carlton $31.16 million. *See Arkoma Basin Expl. Co., Inc. v. FMF Assocs. 1990-A, Ltd.*, 249 S.W.3d 380, 390–91 (Tex. 2008) (trial court's remittitur "modifies" jury's verdict); *see also Salmon v. Salmon*, 395 S.W.2d 29, 32 (Tex. 1965) ("[A] remittitur . . . simply reduces the judgment to the highest figure

20

warranted by the evidence."); *PNS Stores, Inc. v. Munguia*, 484 S.W.3d 503, 513 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (suggesting remittitur to "the highest amount of actual damages supported by the evidence").

On appeal, this Court reversed the trial court's judgment and reinstated the jury award. After a petition for review was filed in the supreme court, our mandate was held in abeyance. *See* TEX. R. APP. P. 18.1 (issuance of mandate delayed where further appellate review sought); *Tex. Parks & Wildlife Dep't v. Dearing*, 240 S.W.3d 330, 347 (Tex. App.—Austin 2007, pet. denied) (mandate constitutes "formal command requiring lower court to comply with the appellate court's judgment"); *see also Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 208 (Tex. 1996) ("If an appeal is taken, the proceedings are not terminated until the final disposition of the appeal and of any further proceedings that it may entail."); *Street v. Hon. Second Ct. of Appeals*, 756 S.W.2d 299, 301 (Tex. 1988) ("[T]he term 'final,' as applied to judgments, has more than one meaning."). The supreme court then reversed the damages portion of our judgment and remanded that portion of the case to this Court for further proceedings. The trial court's judgment remained the operative judgment, pending the outcome of the remand. *See* 5 MCDONALD & CARLSON, TEX. CIV. PRAC. § 30:20 (2d. ed.) ("[T]he trial court['s] judgment must remain the operative judgment until the appellate process is complete and a judgment

21

is entered by the appellate court and the appellate court issues its mandate requiring recognition and enforcement of its judgment.").

Moreover, were we to conclude that the trial court's judgment is now a "nullity," as Phillips and the Phillips entities assert, this Court would no longer have jurisdiction over the appeal. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001) (absent exception, "appeal may be taken only from final judgment"); *Kilroy v. Kilroy*, 137 S.W.3d 780, 783 (Tex. App.—Houston [1st Dist.] 2004, no pet) (where appellate court lacks jurisdiction, "it can only dismiss the appeal").

To the extent that Phillips and the Phillips entities argue that remand to the trial court for a new trial is necessary because "it is impossible to tell whether the jury credited any of the legally sufficient evidence," we note that the supreme court has denied their motion for rehearing, in which they made this same argument.

**Standard of Review**

We review a trial court's order of remittitur under a factual sufficiency standard. *Larson v. Cactus Util. Co.*, 730 S.W.2d 640, 641 (Tex. 1987); *Carter v. Steverson & Co.*, 106 S.W.3d 161, 168 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). In conducting a factual-sufficiency review, we must examine, consider, and weigh all of the evidence that supports or contradicts the trial court's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). When a party attacks the factual sufficiency of an adverse finding on an issue on which the

22

opposing party has the burden of proof, we will set aside the verdict only if the evidence supporting the finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). The fact finder is the sole judge of the witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**Factual Sufficiency**

In their brief on remand, Phillips and the Phillips entities argue that the evidence is factually insufficient to support the trial court's award of $31.16 million in actual damages based on Huddleston's third damages model because his "own testimony conclusively refutes the 'reasonable certainty' of his numbers" and an "entity's value cannot be set by the value of a part thereof absent some evidence that a similar market exists for the rest of the entity." They assert that "[e]ven if factually sufficient evidence supports Huddleston's 'extrapolation' as to gross value, insufficient evidence supports his concomitant assumption about the offset for drilling."

"A property's fair market value is what a willing buyer would pay a willing seller, neither acting under any compulsion." *Phillips*, 475 S.W.3d at 278. "Fair market value is generally determined either by using comparable market sales, calculating replacement cost less depreciation, or capitalizing net income—that is,

23

profits." *Id*. Lost profits can be recovered only when the amount is proved with reasonable certainty. *Id.* The reasonable certainty requirement "is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Id.* (internal quotations omitted). "It is impossible to announce with exact certainty any rule measuring the profits the loss for which recovery may be had." *Id.* (internal quotations omitted). And "[w]hat constitutes reasonably certain evidence of lost profits is a fact intensive determination." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). However, at a "minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id*. "[U]ncertainty as to the fact of legal damages is fatal to recovery, but uncertainty as to the amount will not defeat recovery." *Phillips*, 475 S.W.3d at 280 (internal quotations omitted) ("A party who breaks his contract cannot escape liability because it is impossible to state or prove a perfect measure of damages.").

In its opinion in the instant case, the Texas Supreme Court noted that while it has "never spoken to whether this requirement of reasonable certainty of proof should apply when lost profits are not sought as damages themselves but are used to determine the market value of property for which recovery is sought, it clearly must." *Id*. The court explained:

> The purpose of the requirement is to prevent recovery based on speculation. We can think of no reason . . . why it would make sense

24

to deny damages based on speculative evidence of lost profits but allow recovery of lost value based on the same evidence. But when evidence of potential profits is used to prove the market value of an income-producing asset, the law should not require greater certainty in projecting those profits than the market itself would. The reasonable certainty requirement serves to align the law with reality by limiting a recovery of damages to what the claimant might have expected to realize in the real world had his rights not been violated; the requirement should not be used to deny a claimant damages equal to the value the market would have placed on lost property.

*Id.*; *City of Harlingen v. Estate of Sharboneau*, 48 S.W.3d 177, 182 (Tex. 2001) (discussing "comparable sales" method to determining market value).

Here, the trial court awarded Carlton, on its tortious-interference claim, $31.16 million in actual damages, as the fair-market value of its 38% interest in the Bulgaria Project, measured at the time that it was deprived of its interest as a result of the tortious interference. As evidence of the fair market value of Carlton's 38% interest in the Bulgaria Project, the trial court had before it the expert testimony of Dr. Crichlow and Huddleston. Crichlow testified that he obtained his doctorate in petroleum engineering from Stanford University and had previously served as a professor of engineering and the head of the Department of Petroleum Natural Gas and Geological Engineering at the University of Oklahoma. His company, HBC Registered Professional Engineers, is involved in reserve evaluations of major oil fields, and he had previously worked for the World Bank in evaluating the reserves for the country of Bolivia in order to justify the construction of a pipeline from Bolivia to Brazil and Argentina. Crichlow had also worked with the country of

25

Kuwait "to decide which wells should be looked at first" to ensure "minimal loss of resources" as a result of the Kuwaiti oil-field fires in 1991. He had also worked for the United States Federal Deposit Insurance Corporation to evaluate 29,000 oil and gas reserves packages that were being held by banks. And, Crichlow is the author of a book titled, *Modern Reservoir Engineering—A Simulation Approach*.

In his June 28, 2004 memorandum report, Dr. Crichlow explained that he had reviewed the Bulgaria Project, his recommendations were "favorable," the Bulgaria Project had "several highly desirable characteristics," and the detailed characteristics made the project a "valuable international project." He discussed the Bulgaria Project's geology, resource base, economics, gas valuation, and regulatory requirements. And Crichlow emphasized the Bulgaria Project's existing exploratory drilling, "relatively shallow depth," "excellent economics," and "pipeline availability."

In his October 11, 2004 "interim due-diligence report" prepared "for Mr. Gene Phillips et al," Dr. Crichlow, who had met with the principals of Raven Ridge Resources, a consulting company involved in energy resource assessment, to discuss the "administrative, commercial, political, engineering and operational aspects" of the Bulgaria Project, issued his findings, conclusions, and recommendations. Crichlow also summarized CBM's exploration and prospecting programs. And he emphasized that it was "very unusual to have the amount of data available for a

26

project of this type," the Bulgaria Project had a "greatly reduce[d] . . . investment risk," and it had a "[b]illion dollar profit potential." Thus, Crichlow "highly recommended" that Phillips enter into a partnership with CBM and a Phillips-related entity supplant Carlton's position in the Bulgaria Project. He concluded that a "successful partnership with CBM that includes the anticipated cash flow from gas production, should allow the reinvestment in Bulgaria to compound the returns to [Phillips] many times over."

Huddleston, a registered professional engineer and the principal of Huddleston & Company, a consulting firm of petroleum and geological engineers, testified that he was involved in oil and gas consulting, exploration, and production. He noted that his company has worked for over 500 companies, including "every major oil company" and most "large independents." It had also been retained on a major project for the United Nations to assess the losses to oil and gas reserves as a result of Operation Desert Storm. Huddleston explained that he has been "involved in virtually every phase" of "upstream activities," including exploration and development of prospects; his company has been involved in "several billion dollars of consulting on buy-sell projects"; he has furnished reports to the United States Securities and Exchange Commission and public companies; and he has been involved in project analyses, including the estimation of reserves for transmission lines in the United States. Huddleston, who analyzes approximately 200 projects

annually, taught two senior engineering courses— petroleum management and petroleum investment analysis—at Texas A&M University from 1981 to 1998. He had also prepared manuals that were used by the petroleum schools at the University of Texas and Louisiana State University. Huddleston noted that he has published in excess of 300 papers on oil and gas topics and made presentations for multiple organizations, including the Society of Petroleum Evaluation Engineers and the Texas Bar Association.

In calculating the fair market value of Carlton's 38% interest in the Bulgaria Project at the time of Phillips's tortious interference, Huddleston testified that he considered the "fair market value" as that "established by a willing buyer with no compulsion to buy and willing seller with no compulsion to sell, both having knowledge of all of the factors." He noted that it is "very common" for interests in ventures such as the Bulgaria Project to be bought and sold before there is any production from the venture. And he explained that

> comparables in oil and gas reserves are not the same as comparables in real estate. Real estate, if you go on a block and one house sells for a hundred thousand, the other one sells for 110,000, now you['ve] got comparables . . . . Oil and gas changes very dramatically over a short period of time. So when we go to comparables, we're looking at what the economic criteria of the market is saying.

In terms of the market for the Bulgaria Project, Huddleston testified that he considered to be a reliable indicator how Phillips had himself valued the venture, as evidenced by the Carlton/Phillips and CBM/EurEnergy agreements. In the

28

Carlton/Phillips agreement, which Phillips signed in August 2004, Phillips had agreed to pay Carlton $8.5 million for a 10% working interest in the Bulgaria Project, which he computed to $85 million for a 100% interest. And Huddleston noted that Carlton was required to pay "100 percent" of the cost of the three wells. Thus, he opined, the total value of the Bulgaria Project at the time of the tortious interference could be calculated to have been approximately $85 million and, after the subtraction of $3 million in well costs—a number derived from Phillips's own expert, Dr. Crichlow—the net market value of the Bulgaria Project could be calculated to have been approximately $82 million. And the approximate fair market value of a 38% interest in the Bulgaria Project at the time of the tortious interference could be calculated to have been at least approximately $31 million.

Huddleston further testified that in February 2005, Phillips, after withdrawing from the Carlton/Phillips agreement, then "earn[ed] his way" back into the Bulgaria Project by "paying up to 6 and a half million dollars for a 60 percent interest" under the CBM/EurEnergy agreement. Huddleston noted that although that "sounds like a lot better deal," Phillips was also required under the agreement to "pay 40 percent of the well costs" in addition to operating and gas transmission costs. Huddleston explained that "if you carry it forward, where potentially you could drill 3 or 400 wells, you could see that is $3 or $4 million and a 40 percent carry. It's very expensive" and "could have committed him to $500 million [in] drilling costs."

Huddleston opined that "this confirms that the first price," that which Phillips had agreed to pay under the Carlton/Phillips agreement, was "probably a reasonable price."

Huddleston further noted that Phillips was a knowledgeable buyer and CBM was a knowledgeable seller. He explained that Phillips had a "unique position in Bulgaria," in that he "owned a lot of commercial systems" and had done "a good bit" of business there, which "gives you a lot of advantage to understand how a particular government [is] working." Phillips had previously invested in the petroleum industry. CBM was also "very knowledgeable." And the parties, respectively, clearly had a desire to buy and sell, otherwise "they wouldn't have signed the agreement."

In regard to the risks of the venture, Huddleston testified that he did not separately discount his valuation because Phillips was "in a position to weigh the difficulties" and the risks were subsumed in the prices he negotiated. Specifically, the "Risk Factor Addendum" to the Carlton/Phillips agreement provides:

> The success of the project will depend to a great extent on the operations, financial condition, management, and other risk factors associated with an exploration project, which is subject to many uncontrollable factors associating with involvement and operations in foreign countries, including the application of governmental regulations in Bulgaria, which may affect the contemplated projects or affect the decisions on whether or not to continue business. . . . [And Phillips] understands the risks of, and other considerations related to, an acquisition of the Interest. . . .

Notably, although Phillips had a "30-day period to review all documentation and technical information" in connection with the project and could have withdrawn if, "for any reason," he was "not satisfied," he did not do so within the period. The record also shows that Phillips met with Dr. Crichlow prior to signing the Carlton/Phillips agreement.

Although Phillips and the Phillips entities again argue on remand that Huddleston should not have considered the value expressed in the Carlton/Phillips agreement because the agreement ultimately was never consummated, the fact that a contract is not consummated does not necessarily deprive it of evidentiary value when determining the fair market value of the interest at issue. *See Moore v. Bank Midwest, N.A.*, 39 S.W.3d 395, 402 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) ("unconsummated earnest money contract" constituted competent evidence of market value); *Robards v. State*, 285 S.W.2d 247, 249 (Tex. Civ. App.—Austin 1955, writ ref'd n.r.e.) (unconsummated contract for sale of land evidence of fair market value). Moreover, the jury found that Phillips had failed to comply with the Carlton/Phillips agreement.

Phillips and the Phillips entities further argue that Huddleston erred in calculating the value of Carlton's interest by simply extrapolating from the Carlton/Phillips agreement because "[a]n entity's value cannot be set by the value of a part" and "no one else offered anything close to Phillips's offer." They assert

31

that Carlton's project was a "wildcat Bulgarian coalbed methane concession" with "no viable market." In support of this argument, Phillips and the Phillips entities solely rely on *Cameron Development Company v. United States*, 145 F.2d 209, 210 (5th Cir. 1944). In *Cameron*, however, "[n]o evidence was offered to prove that *any* market existed, or was reasonably likely to exist in the near future," and "[n]o showing was made that *any* purchaser was willing to pay any more for the land, because of the shell deposits, than its market value as pasture land." *Id.* (emphasis added).

Here, as the supreme court concluded in its opinion, Huddleston's "[s]impl[e] extrapolati[on]" was a "calculation . . . based on an actual offer by a willing buyer—Phillips—to a willing seller—Carlton." *Phillips*, 475 S.W.3d at 282. And, "[w]hile Huddleston's other models were based on unverifiable assumptions regarding what the concession would actually produce, in this third model those assumptions were subsumed in the assessment of the data by real investors in a market in which such interests are sold." *Id.* The court held that "the amount Phillips was willing to pay Carlton, for the very interest at issue," constituted "some evidence to support the verdict." *Id.*

Further, "Huddleston testified that there is widespread interest in investment in oil and gas development projects, based on available data, much like that available for the Bulgarian prospect." *Id.* And, although Phillips and the Phillips entities

32

argued that there was "no real market for the Bulgarian prospect, that CBM and Carlton had made every effort to locate potential investors in the prospect, that all had declined, and that in the end, there was at best a market of one: himself[,] . . . there were at least three other investors [Carlton, Assil, and Scholz]." *Id.*

Phillips and the Phillips entities complain that Huddleston also erred in not looking to the Assil and Scholz investments to calculate the fair market value of Carlton's interest. Huddleston explained that, in calculating the fair market value of Carlton's interest, he did not take into account that Assil and Scholz had each agreed to pay $300,000 for a 9.5 percent portion of Carlton's interest. He deemed Dr. Critchlow's reports and the Carlton/Phillips and CBM/EurEnergy agreements to be "the most relevant information." And his "major consideration" was the Carlton/Phillips agreement and "then the circumvention of Carlton on the second agreement [CBM/EurEnergy agreement]." Huddleston opined that if Phillips had "really believed" that the Bulgaria Project was too risky or speculative, he "wouldn't have signed the second transaction." Thus, Huddleston "weigh[ed] the second transaction, the business aspects of it, very heavily."

Further, the record shows that Assil and Scholz simply supplied specific funding, and Assil provided a $300,000 "loan" to O'Dell, based on the amounts Carlton had requested in order to fulfill its first tranche to CBM. Assil testified that he was "open" to investing more, but there had been "no request." Scholz testified

33

that he "put up the money that [he] was told to put up." And he did not recall whether anyone had ever asked him for additional funds. From the evidence presented, the trial court could have reasonably concluded that these transactions were not representative of the fair market value of Carlton's interest.

Moreover, as the supreme court noted, Phillips and the Phillips entities, in attacking Carlton's expert evidence and underlying data on actual damages in the trial court below, "offered no evidence of the value of the prospect." *See id.* at 275. And, as we previously noted, they did not present any expert testimony of their own to suggest a lesser, alternative fair market value of Carlton's interest in the Bulgaria Project. *See Phillips*, 369 S.W.3d at 453. Rather, their primary contention was that, regardless of liability, which they vigorously challenged, Carlton was not entitled to recover anything for its lost interest. Nor have they directed us to any record evidence establishing that it was inherently unreasonable for the trial court to have relied upon Carlton's expert evidence or the underlying data in determining the fair market value of its interest in the Bulgaria Project. Indeed, assessing the fair market value of Carlton's interest in the project was the trial court's job as fact finder. *See Jackson*, 116 S.W.3d at 761.

Here, the trial court had before it Huddleston's testimony, in which he calculated, by "[s]imply extrapolating," that the "entire prospect was worth $85 million less $3 million to drill the three required wells, and thus that the value of a

38% interest was $31.16 million." *Phillips*, 475 S.W.3d at 282–83. "This calculation is based on an actual offer by a willing buyer—Phillips—to a willing seller—Carlton." *Id.* ("[R]easonable certainty must be measured in context, and when projected profits are considered in determining the value of a mineral prospect to be actually purchased or sold, the relevant metrics are supplied by the business market that values, invests in, and trades on such interests."). Further, the trial court had Dr. Crichlow's reports, in which he explained that he had reviewed the Bulgaria Project, his recommendations were "favorable," the Bulgaria Project had "several highly desirable characteristics," and the detailed characteristics made the project a "valuable international project." He discussed the Bulgaria Project's geology, resource base, economics, gas valuation, and regulatory requirements. And he emphasized the Bulgaria Project's existing exploratory drilling, "relatively shallow depth," "excellent economics," and "pipeline availability." Further, in a report he prepared for Phillips, Crichlow emphasized that it was "very unusual to have the amount of data available for a project of this type," the Bulgaria Project had a "greatly reduce[d] . . . investment risk," and it had a "[b]illion dollar profit potential." And the trial court had before it evidence that Phillips himself so highly valued Carlton's interest in the Bulgaria Project that he was willing to breach the Carlton/Phillips agreement and supplant Carlton's interest by forming his own partnership with CBM.

We conclude that that the evidence supporting the trial court's award of $31.16 million in actual damages to Carlton, as the fair market value of its interest in the Bulgaria Project at the time that Phillips and EurEnergy tortiously interfered with the CBM/Carlton agreement, is not so weak as to render the award clearly wrong and manifestly unjust. *See Cain*, 709 S.W.2d at 176. Accordingly, we hold that the evidence is factually sufficient to support the trial court's award to Carlton of $31.16 million in actual damages against Phillips and the Phillips entities.

## Conclusion

We affirm the portion of the trial court's judgment awarding Carlton $31,160,000 in actual damages against Phillips and the Phillips entities, jointly and severally.

Terry Jennings
Justice

Panel consists of Justices Jennings, Higley, and Lloyd.